The **RATH PACKING COMPANY,** a corporation, Plaintiff, Counter-Defendant and Appellant,

v.

**M. H. BECKER,** as Director of the County of Los Angeles Department of Weights and Measures, Defendant, Appellee and Cross-Appellant,

**C. B. Christensen,** as Director of Agriculture of the State of California, Intervenor, Appellee and Cross-Appellant.

The **RATH PACKING COMPANY,** a corporation, Plaintiff and Appellant,

v.

Nos. 73–2481, 73–2482, 73–3092, 73–2496 and 73–3180.

United States Court of Appeals, Ninth Circuit.

Oct. 29, 1975.

Certiorari Granted April 19, 1976. See 96 S.Ct. 1663.

---

Arnold K. Graham, Deputy County Counsel (argued), Los Angeles, Cal., for M. H. Becker.

Allan J. Goodman, Deputy Atty. Gen. (argued), Los Angeles, Cal., for C. B. Christensen.

Loyal E. Keir, Deputy County Counsel (argued), Riverside, Cal., for Joseph W. Jones.

Dean C. Dunlavey (argued), of Gibson, Dunn & Crutcher, Los Angeles, Cal., for Rath Packing Co.

## OPINION

Before BROWNING and TRASK, Circuit Judges, and RICH, Judge.*

RICH, Judge:

These suits were brought by Rath Packing Company (hereinafter "Rath") to enjoin the enforcement of certain California statutes and regulations pertaining to the labeling by weight of packaged foods at retail, and for a declaration that the federal Wholesome Meat Act of 1967, 21 U.S.C. § 601 et seq., and a regulation promulgated thereunder, 9 CFR 317.2(h)(2), preempt these California statutes and regulations. They were consolidated for decision in the district court and on appeal.

Rath is a nation-wide processor and seller of meat products, including bacon, and maintains a meat-packing establishment at Vernon, California, which is subject to federal inspection under the Wholesome Meat Act and 9 CFR 302.1 as an establishment in which "any products of * * * carcasses of livestock are * * * prepared for transportation or sale as articles of commerce, which are intended for use as human food." Becker and Jones are the Directors of the Departments of Weights and Measures of Los Angeles and Riverside Counties, California, respectively. They are responsible for the actual enforcement of the State weights and measures laws in their counties. Intervenor Christensen is the Director of Agriculture of the State of California.

Jurisdiction in the district court was based on 28 U.S.C. § 1331(a), as it was alleged that a case or controversy arising under the laws of the United States involving more than $10,000 was presented.[1] We have jurisdiction of this appeal under 28 U.S.C. § 1291.

The district court, in a memorandum and order reported at 357 F.Supp. 529 (C.D.Cal.1973), granted in part the relief requested, and all parties appealed the determinations adverse to them.

This case is a companion to *General Mills, Inc., et al. v. Jones*, 530 F.2d 1317, decided concurrently herewith. Much of the discussion in this opinion is applicable to the *General Mills* case as well.

### Background

This case concerns the packaging and weighing of bacon. In order to understand the issues, a brief description of the properties of bacon and how it is packed and weighed is necessary.

The weighing and packaging of bacon at the Rath plant takes place under internal Rath procedures which have been submitted to an official of the United States Department of Agriculture (USDA). After the pickled and smoked pork bellies come from the bacon press, where they are squared into uniform rectangular shapes, they are sliced by a machine, which distributes the slices in "drafts" of approximately one pound

---

* The Honorable Giles S. Rich, Judge, United States Court of Customs and Patent Appeals, sitting by designation.

1. It is not disputed that the jurisdictional amount is present.

weight. An operator places each draft on an insert, or "tux", board, which is a hardboard coated either with wax or with polyethylene.[2] The drafts are then passed to a scaling station, where they are weighed and the operator either adds or removes bacon to bring the weight within a predetermined target limit. After scaling the bacon is passed to a tux overwrap machine, which inserts the bacon into a carton and seals it. This carton is not hermetically sealed and the bacon in it does lose some moisture to the atmosphere over time. Although Rath now does use some hermetically sealed bacon containers, this packing method is agreed to be in accordance with good distribution practices. Once the bacon is weighed at the scaling station, it is not weighed again before it leaves the Rath plant, an average of 4 days, never more than 8 or 9 days, later. In determining the pass zone Rath follows the USDA procedure of subtracting from the actual weight of the draft and the tux board on which it lies the weight of a *dry* tux board. This method uses a "dry tare." [3] There is no evidence that Rath has violated federal weight standards in any way.

The federal program for regulation of net weight labeling of meat and meat food products exists in part under the Wholesome Meat Act of 1967, supra. The Act added the concept of "misbranding" to the prior federal meat inspection laws. 21 U.S.C. § 601(n) provides in relevant part:

> (n) The term "misbranded" shall apply to any carcass, part thereof, meat or meat food product under one or more of the following circumstances:
>
> \* \* \* \* \* \*
>
> (5) if in a package or other container unless it bears a label showing (A) the name and place of busi-ness of the manufacturer, packer, or distributor; and (B) an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count: *Provided,* That under clause (B) of this subparagraph (5), reasonable variations may be permitted, and exemptions as to small packages may be established, by regulations prescribed by the Secretary [of Agriculture];
>
> \* \* \* \* \* \*

In 9 CFR 317.2(h)(2) the Secretary purported to implement § 601(n)(5):

> (2) The statement as it is shown on a label shall not be false or misleading and shall express an accurate statement of the quantity of contents of the container exclusive of wrappers and packing substances. Reasonable variations caused by loss or gain of moisture during the course of good distribution practices or by unavoidable deviations in good manufacturing practice will be recognized. Variations from stated quantity of contents shall not be unreasonably large.

In the supermarket the California inspectors employed a different weighing method, using a "wet tare." [4] The California procedure is set forth in detail in 4 Cal.Admin.Code ch. 8, subch. 2, Art. 5. Briefly, the California inspectors follow a twelve-step procedure set forth in Section 2933.3 of the regulations:

> (1) determine the number of packages in the lot to be sampled;
>
> (2) from a table in the regulation, determine the total package sample size (e. g., 15 packages out of a lot of 300);
>
> (3) from the same table, determine the tare sample size (e. g., 2 packages out of a lot of 300);
>
> (4) record the gross weight of each tare sample package;

---

**2.** The polyethylene-coated boards have absorbed $\frac{4}{16}$ oz. less of bacon moisture and grease than the wax-coated board 4 days after pack. The saturation point of waxed board is reached 6 to 9 days after pack; about $\frac{5}{16}$ oz. is absorbed.

**3.** "Tare. \* \* \* 1a: the weight of a container or vehicle that is deducted from the gross weight to obtain the net weight." *Webster's Third New International Dictionary* 2341 (1971).

**4.** The difference in tares employed is not an issue in this case.

(5) remove the usable contents from each tare sample, weigh the used, empty container, and compute the average tare weight; [5]

(6) weigh the remaining packages in the package sample and record their weights, determining the amount of error from labeled weight for each package;

(7) [not applicable to bacon];

(8) calculate the preliminary total error for the sample, and determine the arithmetical average error;

(9) calculate the range of error for each sub-group of the package sample;

(10) determine whether any unreasonable errors exist, and eliminate from further computations all samples whose errors exceed the preliminary average error in underweight situations by more than the amounts set forth in tables in the regulations; if the number of unreasonable errors exceeds a certain set figure for each sample size, further action, including the issuance of off-sale orders, may be undertaken.

(11) recalculate the total and average error of the sample excluding the unreasonable errors;

(12) "(a) If the total error as obtained from the sample is plus and is less than the value shown in Table III for the corresponding range and sample size, then a shortage may or may not exist, and additional samples may or may not be taken, depending upon the discretion of the weights and measures official. If no additional samples are taken then the procedures as set forth in the following sections shall govern the disposition of the lot.

"(b) If the total error obtained from the sample is less than the above-determined value, and the error is minus, then a shortage may or may not exist, and additional samples may or may not be taken, depending upon the discretion of the weights and measures

official. If no additional samples are taken the lot shall be passed. If additional samples are taken then the procedures as set forth in the following sections shall govern the disposition of the lot." [Sec. 2933.3.12.]

If an inspector cannot pass the lot based on this sampling technique or after retesting, he then may order the lot off-sale under the provisions of California Business and Professions Code § 12211:

Each sealer shall, from time to time, weigh or measure packages, containers or amounts of commodities sold, or in the process of delivery, in order to determine whether the same contain the quantity or amount represented and whether they are being sold in accordance with law.

\*　　\*　　\*　　\*　　\*　　\*

Whenever a lot or package of any commodity is found to contain, through the procedures authorized herein, a less amount than that represented, the sealer shall in writing order same off sale and require that an accurate statement of quantity be placed on each such package or container before the same may be released for sale by the sealer in writing. The sealer may seize as evidence any package or container which is found to contain a less amount than that represented.

Evidence was adduced at the trial from various California officials, including Becker, that the county departments do not recognize variations in net weight that result from water loss during good distribution practice. Mr. Cervinka, a statistician employed by the California Department of Agriculture, testified on direct examination as an expert for Christensen that Art. 5 of the regulation, described above, is a statistically valid procedure. On cross-examination he indicated that Art. 5 does not make any distinction between products that lose

---

**5.** The container and tux board are weighed with all matter adhering to the tare that does not pull off when the bacon is removed includ-

ed, as well as with any grease or moisture that the tux board may have absorbed from the bacon. This is "wet tare."

water and those that do not, nor does it make provision for any weight reductions during the course of handling. On this and other evidence the district court concluded that Art. 5 uses "absolute" weight as determined by statistical methods as its measure of compliance and makes no reference in describing the steps of the weighing and calculating process to reasonable variations from label weight caused by "loss * * * of moisture during the course of good distribution practice." The district court's fact findings have substantial evidentiary support and are not clearly erroneous. F.R.Civ.P. 52(a). Becker, Christensen, and Jones do not urge error in the district court's construction of Art. 5.

### Procedural History

During the period September 1971 to March 1972 inspectors under the supervision of Becker and Jones visited supermarkets in Los Angeles and Riverside Counties and weighed packages of Rath bacon to determine compliance with the State statute and regulations concerning net weight labeling. Becker's representatives ordered approximately 84 lots of bacon off sale for short weight; Jones ordered nearly 400 packages of Rath bacon off sale in the period September 29 to December 30, 1971, for the same reason.

On February 17, 1972, the Riverside County Counsel brought an action in the name of the People against Rath in the Superior Court for Riverside County for an injunction under Cal.Civ.Code § 3369 [6] and for civil penalties under Cal.Bus. and Prof.Code § 17536,[7] alleging that Rath had committed acts of unfair competition in violation of Cal.Bus. and Prof. Code § 17500 [8] by distributing for sale in Riverside County supermarkets the packages of bacon that Jones' representatives had ordered off sale. On March 1, 1972, the Los Angeles County Counsel filed a similar action against Rath in the Superior Court for Los Angeles County.

Rath removed both actions to federal district court within a week thereafter; but on March 20, 1972, the district court remanded the actions to the State courts, finding, at least with respect to the Riverside action, that there was no diversity of citizenship and that "[n]o substantial federal question is presented on the face of the pleadings."

Meanwhile, on March 17, 1972, Rath filed two actions in federal district court, one against the People [9] and Becker, the other against Jones. Rath requested declarations that the California statutes and regulations impose labeling standards on meat food products prepared by Rath that are in addition to or different than the standards of the Wholesome Meat Act of 1967, specifically 21 U.S.C. § 601(n)(5) and 9 CFR 317.2(h)(2) and that California could not impose weight

6. Civil Code § 3369 provides in material part:
 2. Any person performing or proposing to perform an act of unfair competition within this State may be enjoined in any court of competent jurisdiction.
 3. As used in this section, unfair competition shall mean and include * * * any act denounced by Business and Professions Code Sections 17500 to 17535, inclusive.

7. Section 17536:
 (a) Any person who violates [§ 17500] shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General or by any district attorney, county counsel or city attorney in any court of competent jurisdiction.

8. Section 17500:
 It is unlawful for any * * * corporation * * * to make or disseminate or cause to be made or disseminated before the public in this State, * * * any statement concerning * * * personal property * * * or concerning any circumstances or matter of fact connected with the * * * disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading * * *.

9. The People were dismissed as a party by the district court on the ground that the Eleventh Amendment bars suits against the State of California by a citizen of another State. Rath is an Iowa corporation and is a citizen of Iowa for this purpose. No appeal was taken from this dismissal.

labeling requirements on Rath meat food products after they left the Rath plant. Rath also requested injunctions against the enforcement by Becker and Jones of labeling requirements in addition to or different than those in the Act and against the ordering off-sale or otherwise preventing the sale of Rath products for failure of the products to bear an accurate label in terms of net weight after they have left Rath's plant. Becker, Jones, and Christensen counterclaimed for the same relief sought by the State in the state court actions.

After the remands, on March 30, 1972, Rath answered the state court complaints and filed cross-complaints seeking the same relief, in virtually the same language, as Rath sought in federal court. In July 1972 Christensen intervened in both the state and federal court litigations.

Becker filed in the district court motions requesting the court either to abstain from deciding the federal court action or to stay the federal action pending final determinations in the state court actions. The district court denied these motions in May 1972. On November 14, 1972, the superior court in the Riverside action dismissed Rath's cross-complaint; Rath appealed. On the very next day, Christensen and Becker moved the district court to dismiss Rath's action or to stay it pending decision on Rath's state appeal. The district court denied the motions, and this court, on Christensen and Becker's petition for a writ of prohibition, declined to disturb the district court's assumption of jurisdiction.

On April 3, 1973, the district court, after a trial on the merits of Rath's action against Becker and on cross-motion for summary judgment in the action against Jones, entered judgment declaring Cal.Bus. and Prof.Code § 12211 and 4 Cal.Admin.Code ch. 8, subch. 2, Art. 5 to be preempted by federal law and enjoining their enforcement. In the course of its Memorandum the court held that 9 CFR 317.2(h)(2) was invalid, and that thus the sole federal labeling standard was "accurate" weight. The court also

held that accurate weight labeling standards could be applied to packages of meat and meat food products at the retail level. Cross-appeals were taken to this court.

The Riverside action continued, and in January 1974, while Rath's first appeal was still pending in the California District Court of Appeal, the superior court entered summary judgment on the complaints of Jones and Christensen against Rath; Rath appealed again. In an unreported decision in April 1974 on Rath's first appeal, the California appellate court reversed the dismissal of Rath's cross-complaint against Jones, holding that the federal court's judgment was *res judicata* on the issue of the validity of § 12211 and Art. 5 (to the extent that it implemented § 12211). On Rath's second appeal, in December 1974, the appellate court reversed the grant of summary judgment on the complaints and remanded the case to the Riverside superior court for trial, holding that there existed issues of fact that required trial. *People v. Rath Packing Company*, 44 Cal. App.3d 56, 118 Cal.Rptr. 438 (1974). The appellate court also explained further the basis of its decision on Rath's first appeal, holding that the effect of the federal court judgment was to preclude relitigation of the narrow issue of the preemption of § 12211, and its implementation in Art. 5, by the Wholesome Meat Act. The appellate court held, 118 Cal. Rptr. at 446 n.6, that Art. 5 is not unconstitutional.

Although the record does not contain any notice of the proceedings in the Los Angeles superior court action, we are informed by Rath's reply brief that in February 1974 the Los Angeles court gave *res judicata* effect to the final judgment on the preemption issue and decided in Rath's favor the issues of constitutionality and whether Becker's ordering of Rath's bacon off sale complied with state law. An appeal from this judgment is pending.

### I.

Becker, Jones, and Christensen contend that the district court lacked juris-

diction of the subject matter before it, and, in the alternative, that the principles of abstention and comity required the court to stay its hand until the state court actions had proceeded to judgment. We reject both contentions.

### A.

■ The question of subject matter jurisdiction may be raised by the parties at any time or by the court sua sponte. *Clark v. Paul Gray, Inc.*, 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1938); F.R. Civ.P. 12(h)(3). Becker et al. first contend that the declaratory judgment actions brought by Rath are nothing more than attempts to get collateral review of the remands to state court of the actions brought against Rath by the People which Rath had removed to the district court. 28 U.S.C. § 1447, provides:

§ 1447. *Procedure after removal generally.*

\* \* \* \* \* \*

(d) An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise \* \* \*.

Their second contention is that Rath's claim for declaratory and injunctive relief in the district court is in reality a defense to the state court actions, and, as such, cannot form a basis for federal question jurisdiction under 28 U.S.C. § 1331.

After the institution of Rath's federal action Becker at al. presented these contentions to this court by way of a petition for a writ of prohibition, *Becker et al. v. Real*, No. 72–3037, which the court, ELY and HUFSTEDLER, Circuit Judges, denied.[10] We find no reason to depart from that decision.

■ Federal question jurisdiction is determined by the federal district court solely from the face of plaintiff's complaint. *Gully v. First National Bank*, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936). Removability cannot be created by defendant pleading a counter-claim presenting a federal question under 28 U.S.C. § 1331. See 1 Barron & Holtzoff, *Federal Practice and Procedure* (Wright Ed.) § 102; *United Artists Corp. v. Ancore Amusement Corp.*, 91 F.Supp. 132 (S.D.N.Y.1950). Thus, Rath's answer and cross-complaint in the state court, raising its claim for declaratory and injunctive relief under federal law, were not [11] before the district court when it remanded the state court actions and do not raise any issues necessarily adjudicated by the court in deciding to remand. The decision of the district court that the case does not invoke the federal jurisdiction and must be remanded precludes further litigation of the issue of the forum in which the *removed case* is to be litigated. *Missouri Pacific Ry. Co. v. Fitzgerald*, 160 U.S. 556, 583, 16 S.Ct. 389, 40 L.Ed. 536 (1896). The decision of the district court to remand has no bearing on the merits of the underlying claims. Since the district court did not make any decision with respect to the propriety of a federal forum for *Rath's* claims, we cannot say that the maintenance of Rath's claim in federal court works a circumvention of 28 U.S.C. § 1447(d). Cf. *Chandler v. O'Bryan*, 445 F.2d 1045, 1057 (10th Cir. 1971). Rath is not contending that the remand orders were erroneous, but only that it has a right to a federal forum for its alleged federal claims.

The argument that Rath's claims are not within the federal question jurisdiction, it not being denied that there is no diversity of citizenship, takes its roots in the statement of the Supreme Court in *Public Service Commission v. Wycoff*,

---

10. "It appearing from the face of the pleading that the District Court has jurisdiction, the petition is denied. This Court does not, however, now express any further opinion on the merits of the controversy."

We are not foreclosed by this order from reexamining the jurisdictional issue at this time; we merely find the decision to be sound.

11. And could not have been, since the remand order was entered March 20, 1972, and Rath's claims were first presented in the state court actions on March 30, 1972.

344 U.S. 237, 248, 73 S.Ct. 236, 242, 97 L.Ed. 291 (1952):

> Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, *it is the character of the threatened action, and not of the defense*, which will determine whether there is a federal-question jurisdiction in the District Court. If the cause of action, which the declaratory defendant threatens to assert, does not itself involve a claim under federal law, it is doubtful if a federal court may entertain an action for a declaratory judgment establishing a defense to that claim. This is dubious even though the declaratory complaint sets forth a claim of federal right, *if that right is in reality in the nature of a defense to a threatened cause of action*. Federal courts will not seize litigations from state courts merely because one, normally a defendant, goes to federal court to begin his federal-law defense before the state court begins the case under state law * * * (emphasis added [by the Court]).

The doubt that the Court expresses is still with us, e. g., C. Wright, *Law of Federal Courts* § 18, at 62 (2d Ed. 1970).

■ In order to appreciate the *Wycoff* case we must first look to the jurisdictional background of the Declaratory Judgment Act, 28 U.S.C. § 2201.[12] The Act is procedural only, creating a new federal remedy without expanding the jurisdiction of the federal courts. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). " 'Jurisdiction' means the kinds of issues which give right of entrance to federal courts." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950). The *Wycoff* "test" quoted supra has its origins in *Tennessee v. Union & Planters' Bank*, 152 U.S. 454,

464, 14 S.Ct. 654, 657, 38 L.Ed. 511 (1894), where the Court said, "a suggestion of one party, that the other will or may set up a claim under the Constitution or laws of the United States, does not make the suit one arising under that Constitution or those laws." Furthermore, the complaint of the declaratory plaintiff must present a federal question "unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." *Taylor v. Anderson*, 234 U.S. 74, 75–76, 34 S.Ct. 724, 58 L.Ed. 1218 (1914).

In *Wycoff* the complainant brought an action for declaratory judgment against the Utah Public Service Commission, requesting a finding that the business conducted by complainant in carrying goods between points in Utah was interstate commerce (and thus not subject to regulation by the Commission). The principal concern of the Court was the nature of the controversy presented, 344 U.S. at 244, 73 S.Ct. at 240:

> A multitude of rights and immunities may be predicated upon the premise that a business consists of interstate commerce. What are the specific ones in controversy? The record is silent and the counsel little more articulate. We may surmise that the purpose to be served by a declaratory judgment is ultimately the same as respondent's explanation of the purposes of the injunction it originally asked, which is "*to guard against the possibility* that said Commission would attempt to prevent respondent from operating under its certificate from the Interstate Commerce Commission." (Emphasis supplied [by the Court].)

From this the Court concluded that "this dispute has not matured to the point where we can see what, if any, concrete controversy will develop." 344 U.S. at 245, 73 S.Ct. at 241. In the portion of *Wycoff* quoted three paragraphs above,

12. § 2201 provides:

In a case of actual controversy *within its jurisdiction*, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. * * *. (Emphasis added.)

the Court was applying its concern that the controversy was not ripe for adjudication by pointing out a declaratory plaintiff may not *create* a controversy by seeking to have a federal court adjudicate federal defenses he might assert in a proceeding before a state court or administrative tribunal which is not ripe, but which is merely threatened or impending.[13]

■ Another aspect of the matter was aired in *Chandler v. O'Bryan,* supra. O'Bryan brought a libel action in Oklahoma state court against Chandler, a United States District Judge, on statements made by Chandler to a newspaper accusing O'Bryan of bribing judges of the Oklahoma Supreme Court. Chandler removed the action to federal district court; but the district court held that the acts alleged in the complaint were not done in performance of Chandler's official duties as a federal judge, nor were they done under color of judicial office, and remanded the case to the state court for lack of a federal question, there being no diversity of citizenship. It is settled that Chandler's judicial immunity defense arises under federal law. *Howard v. Lyons,* 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959). A verdict for O'Bryan was returned in the state court. Chandler then filed a declaratory judgment action in federal court seeking to have the state libel judgment enjoined and expunged, alleging his federal judicial immunity claim. The district court granted relief to Chandler, 311 F.Supp. 1121 (W.D.Okl.1969), but the 10th Circuit (by a panel of three judges of the 8th Circuit) reversed.

The court found *Wycoff* directly applicable, and held that Chandler was seeking a separate federal adjudication of a matter which was "in reality in the nature of a defense" to the state court libel action, which was based solely on state libel law and raised no federal question itself. The action was dismissed for lack of federal jurisdiction.

■ The instant case is different. While it is true that judgment in Rath's favor affects the results of the Los Angeles and Riverside actions, we cannot say that Rath's action is premature or that Rath's claim is merely a defense to the state court actions. The ordering off-sale of Rath's products in September 1971 and afterward and the upward adjustment of the pass range at the sealing station at Rath's plant, increasing the overpack of bacon necessitated by California weighing procedures, it was stipulated below, caused Rath a loss of more than $10,000. The off-sale orders themselves are sufficient State action to create an actual controversy between Rath and the state weights and measures officials. See *Lake Carriers' Ass'n v. MacMullan,* 406 U.S. 498, 508, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972). The present controversy was not created by the institution of the state court actions against Rath, but arose independently thereof by virtue of the off-sale orders.

Unlike *Chandler,* Rath's claims have vitality in the absence of the litigation in state court; Rath had the right to a federal forum before the institution of the state court actions. Chandler's federal claim was purely in the nature of a defense to the libel action. Brought without reference to the underlying state court proceeding, Chandler's claim would be a useless gesture: no one would care whether Chandler acted un-

---

**13.** The Court confirmed this view of *Wycoff* in *Public Utilities Commission of California v. United States,* 355 U.S. 534, 538–39, 78 S.Ct. 446, 450, 2 L.Ed.2d 470 (1958):

> The Commission has plainly indicated an intent to enforce the Act; and prohibition of the statute is so broad as to deny the United States the right to ship at reduced rates, unless the Commission first gives its approval. The case is, therefore, quite different from *Public Service Commission of Utah v. Wycoff Co.,* 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291, where a carrier sought relief in a federal court against a state commission in order "to guard against the possibility," id., 344 U.S. at page 244, 73 S.Ct. at page 240, that the Commission would assume jurisdiction. Here the statute limits transportation at reduced rates unless the Commission first gives approval. The controversy is present and concrete—whether the United States has the right to obtain transportation service at such rates as it may negotiate or whether it can do so only with state approval.

der the protection accorded by the courts to his office if O'Bryan had refrained from suing him. That Rath's claim is or can be the basis for a defense to the state court actions states a mere truism;[14] the test is whether Rath has created a federal controversy where none existed or is seeking an adjudication of a claim which is essentially meaningful only when pleaded as a defense to the particular pending state court actions. We find neither factor present and consider that Rath has stated claims which are within the federal jurisdiction conferred on the district court by 28 U.S.C. § 1331.[15]

### B.

 We also hold that considerations of comity and abstention did not require the district court to relinquish jurisdiction.

Comity is a principle of long standing:

We live in the jurisdiction of two sovereignties, each having its own system of courts to declare and enforce its laws in common territory. It would be impossible for such courts to fulfil their respective functions without embarrassing conflict unless rules were adopted by them to avoid it. The people for whose benefit these two systems are maintained are deeply interested that each system shall be effective and unhindered in its vindication of its laws. The situation requires, therefore, not only definite rules fixing the powers of the courts in cases of jurisdiction over the same persons and things in actual litigation, but also a spirit of reciprocal comity and mutual assistance to promote due and orderly procedure.

\*　　\*　　\*　　\*　　\*　　\*

The chief rule which preserves our two systems of courts from actual conflict of jurisdiction is that the court which first takes the subject-matter of the litigation into its control, whether this be person or property, must be permitted to exhaust its remedy, to attain which it assumed control, before the other court shall attempt to take it for its purpose. *Ponzi v. Fessenden,* 258 U.S. 254, 259–60, 42 S.Ct. 309, 310, 66 L.Ed. 607 (1921).

This circuit has defined the rule of comity as "merely of recognizing exclusive jurisdiction in the court first acquiring jurisdiction of any action." *Gregg v. Winchester,* 173 F.2d 512, 513 (9th Cir. 1949). Under these rules and in the present circumstances, the principle of comity does not suggest that the district court should have declined to hear Rath's claims. The subject matter of the litigation before us consists of the *federal questions* raised by Rath in its complaint. These federal questions were first taken into the control of a court when Rath filed its complaint in the district court on March 17, 1972. No state court could have acquired jurisdiction over this subject matter until Rath answered and

---

**14.** Becker, Jones, and Christensen do not assert that Rath's cross-complaints in the state court actions were compulsory under Cal.Code of Civ.Proc. § 428.10; they assert that they were *improper* pleadings under the statute. We have no opinion on this matter of state procedure, but it does seem to us to show that the interposition of affirmative claims by Rath in the state courts is not a relevant factor in determining whether the federal courts have jurisdiction of Rath's affirmative claims.

**15.** Jones' argument that the district court improperly assumed jurisdiction of a *res* already in the control of the state courts is without merit. Suits for injunctions are *in personam,* not *in rem, Penn General Casualty Co. v. Pennsylvania,* 294 U.S. 189, 195, 55 S.Ct. 386, 79 L.Ed. 850 (1935), and state and federal

courts having concurrent jurisdiction are "free to proceed in [their] own way \* \* \*, without reference to the proceedings in the other court. \* \* \* The rule, therefore, has become generally established that where the action first brought is *in personam* and seeks only a personal judgment, another action for the same cause in another jurisdiction is not precluded." *Kline v. Burke Construction Co.,* 260 U.S. 226, 230, 43 S.Ct. 79, 81, 67 L.Ed. 226 (1922). We observe that in any case Rath's claims were made in district court thirteen days before Rath's state cross-complaints were filed. The controversy here is not over any property right or status in the *bacon,* but over the enforcement of state laws which affect how the bacon is sold.

filed its cross-complaints in the state courts on March 30, 1972. Our conclusion is reinforced by the actions of the District Court of Appeal in the Riverside action twice giving *res judicata* effect to the federal district court judgment. If, as Becker and Christensen contend, the only matter preventing the first Riverside judgment, dismissing Rath's cross-complaint against Jones, from being given preclusive effect as a final judgment is Cal.Code of Civ.Proc. § 1049,[16] the California appellate court would not have directed the trial court to abandon its position and to follow the federal judgment, which, since it had been appealed, was just as "final" as the Riverside judgment if evaluated under California law. We do not see here the federal-state conflict that the comity doctrine seeks to avoid. The district court acquired jurisdiction over the federal question prior to the state courts, and very scrupulously avoided deciding even tangentially the constitutionality of the California statutes and regulations or whether the actions of the inspectors were in compliance with state law. The state courts have not questioned the right of the district court to take the action it did and held the federal judgment entitled to preclusive effect in the state courts on the particular issues litigated in the federal courts.

 In applying the abstention doctrine a federal district court has *discretion* in *declining* to exercise or *postponing* the exercise of jurisdiction it already has in deference to a state court resolution of underlying issues of state law. *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Abstention is appropriate only where the issue of state law is uncertain, *Harman v. Forssenius,* 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965), and where "the delay and expense to which the application of the abstention doctrine inevitably gives rise" can be justified. *England v. Board of*

*Medical Examiners,* 375 U.S. 411, 418, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). However, abstention is not automatic whenever a question of state law may be involved. As the Court said in *Baggett v. Bullitt,* 377 U.S. 360, 376–77, 84 S.Ct. 1316, 1326, 12 L.Ed.2d 377 (1964), a case in which the Court considered abstention to be unnecessary:

> In the bulk of abstention cases in this Court, * * * the unsettled issue of state law principally concerned the applicability of the challenged statute to a certain person or a defined course of conduct, whose resolution in a particular manner would eliminate the constitutional issue and terminate the litigation.

This statement reflects the judicial policy of avoiding the adjudication of federal constitutional questions unless they are ripe and are squarely presented by the record.

 "The basic question involved in [federal preemption] cases, however, is never one of interpretation of the Federal Constitution but inevitably one of comparing two statutes." *Swift & Co. v. Wickham,* 382 U.S. 111, 120, 86 S.Ct. 258, 264, 15 L.Ed.2d 194 (1965). Thus we do not have a situation where a state law interpretation by a state court may eliminate a federal constitutional question. Cf. *Reetz v. Bozanich,* 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970). There is no contention by Becker, Jones, or Christensen that California law is unclear or ambiguous or that the construction of California law in the state courts will obviate a decision on Rath's federal preemption claim. The California statutes and regulations apply to Rath without question. We think this case is akin to *Harman v. Forssenius,* supra, in which the Court said: "If the state statute in question, although never interpreted by a state tribunal, is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal * * * question, it is the duty

---

**16.** Cal.Code of Civil Procedure § 1049:

An action is deemed to be pending from the time of its commencement until its final

determination upon appeal, or until the time for appeal has passed, * * *.

of the federal court to exercise its properly invoked jurisdiction. *Baggett v. Bullitt,* 377 U.S. 360, 375–379 [84 S.Ct. 1316, 1324–1326, 12 L.Ed.2d 377]." We hold that the district court did not abuse its discretion in refusing to abstain.

## II.

In holding 9 CFR 317.2(h)(2) invalid, the district court said:

> [The section] is void for its inadequacy to set any recognizable standard upon which any individual may measure his conduct or his compliance with the law by which he must order his personal or business life. 357 F.Supp. at 534.

Rath alleges two bases of error: (1) the validity of the regulation was not put in issue by the parties below and should not have been considered by the district court; and (2) the district court erred on the merits of the issue.

Rule 16 of the Federal Rules of Civil Procedure provides that "[t]he court shall make an order * * * which limits the issues for trial to those not disposed of by admissions or agreements of counsel; and *such order* when entered *controls the subsequent course of the action,* unless modified at the trial to prevent manifest injustice." [Emphasis added.] The pretrial order entered by the court with the consent of the parties in the Becker action does not name as an issue the validity of 9 CFR 317.2(h)(2); nor, for that matter, do the pleadings and motion papers in the Jones action. The first appearance of the issue in the Jones action was at the argument on the motions for summary judgment:

> THE COURT: The question is, is the regulation, and that is (h)(1) and (2) and particularly (2), that is 317.2(h)(2), is it a valid regulation.
>
> MR. KEIR [Counsel for Jones]: Well, we don't challenge the validity of (h)(2).
>
> THE COURT: You don't? You don't? I have some serious questions about it.
>
> MR. KEIR: Maybe I should retract that for the record. Frankly, I hadn't

considered whether it is valid or not. I merely submit to the court, and this is the position we have taken right along, is that (h)(2) is an innocuous provision.

It was not until the close of the trial of the Becker action that the district judge requested argument on the issue, and by so doing put the issue before the parties.

Ordinarily, issues not squarely presented in the pleadings and motion papers or not preserved in the pretrial order are considered to have been eliminated from an action. See, *e. g., L & E Co. v. United States ex rel. Kaiser Gypsum Co.,* 351 F.2d 880 (9th Cir. 1965); *Fowler v. Crown Zellerbach Corp.,* 163 F.2d 773 (9th Cir. 1947); see also 3 *Moore's Federal Practice* ¶ 16.19. This is particularly true in a declaratory judgment action, where the court is called upon to adjudicate only those matters as to which the parties ask that their rights be determined. In this case, however, the parties have fully briefed and argued this issue both here and before the district court. In their consolidated post-trial memorandum, Becker and Christensen requested a declaration that 9 CFR 317.2(h)(2) was invalid. Rath does not claim that the court's *consideration* of the issue—as opposed to its *decision* on the issue, with which Rath differs—has resulted in any actual prejudice to it, nor did Rath object in its reply brief in the district court to consideration of the issue. By failing to object, Rath may be deemed to have acquiesced in an expansion of the issues by the court from those set forth in the pretrial order. Furthermore, the issue, as discussed below, is one of "facial" invalidity under the 5th Amendment which does not require a fully developed evidentiary basis for its resolution. Cf. *Rescue Army v. Municipal Court,* 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947). We note the public importance of this question, and the possibility of review of our judgment herein. Since a controversy presently exists between the parties on the issue, and since the judgment of the district court turned in large part on its resolu-

tion of this issue, we proceed to the merits of the controversy.

Although we have some doubts as to the applicability of the "void-for-vagueness" doctrine in its traditional formulation [17] to this non-criminal situation, the parties do not question the doctrine's applicability to this case. However, we need not decide its applicability, since we are of the opinion that the regulation passes muster when the due process standards enunciated by the criminal cases in the economic area are applied to it. There is no claim that 1st Amendment rights are involved, the presence of which would necessitate stricter scrutiny by us. *Smith v. Goguen,* 415 U.S. 566, 572–73, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

The crux of the district court's holding of invalidity can be found in the following [357 F.Supp. at 534]:

What [*United States v. Shreveport Grain & Elevator Co.,* 287 U.S. 77, 53 S.Ct. 42, 77 L.Ed. 175 (1932)], *supra,* is telling us is that the *statutory* delegation is viable. It does not give viability to a redelegation that is subject to different enforcement resulting in varying degrees of reasonableness. The statute [21 U.S.C. § 601(n)(5)] gives the Secretary the power of definition of "reasonable variations." The Secretary here has completely failed to accept the duty that can be expressed only in rules and regulations properly promulgated pursuant to federal law.

[Footnote omitted; emphasis in original.]

Neither the statute nor the regulations contain quantitative statements of what variations will be considered reasonable.[18] There is likewise no evidence tending to show how much weight variation is considered reasonable by the trade. In the absence of evidence of how the regulation is applied, the burden rests on the parties challenging the regulation, Becker and Christensen, to show that the regulation is incapable of setting a standard of enforcement on its face.[19] Their challenge fails for two independent reasons, which correspond to the separate rationales underlying the portions of the district court's opinion reproduced supra.

The district court seems concerned with "reasonableness" as a standard for guiding conduct. This standard is of ancient provenance in English and American law and is not obnoxious in itself to the Fifth Amendment of the Constitution. In the ordinary negligence case, for instance, the sole difference between no liability and a sizeable penalty in the form of damages may be whether the acts in issue are considered those of a *reasonable* man by a jury long after the fact. A more telling analogy is found in the criminal application of the Sherman Act, 15 U.S.C. § 1 et seq. The English courts distinguished legal from illegal contracts restraining trade by whether the restraint imposed was reasonable. *Mitchel v. Reynolds,* 1 P. Williams 181,

---

**17.** *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926):

That the terms of a *penal* statute creating a new *offense* must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. [Emphasis added.]

See also *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954).

**18.** Rath offered as evidence a USDA manual purporting to contain the quantitative variations to be permitted by USDA inspectors, which the court excluded as irrelevant and as not having been promulgated by the Secretary of Agriculture under the Wholesome Meat Act by publication in the Federal Register. Rath does not urge this ruling as error, and we shall not comment on it. Except for this manual, however, Rath concedes that the quantitative scope of "reasonable variations" recognized by the Secretary is nowhere set forth in any writing.

**19.** *United States v. National Dairy Products Corp.,* 372 U.S. 29, 32–33, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963).

24 Eng.Rep. 347 (King's Bench, 1711); see discussion in *United States v. Addyston Pipe & Steel Co.,* 85 F. 271 (6th Cir. 1898), *mod. and aff'd.,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); and *Standard Oil Co. v. United States,* 221 U.S. 1, 51, 31 S.Ct. 502, 55 L.Ed. 619 (1911). *Standard Oil,* supra, construed the prohibition of the Sherman Act against "[Any] contract, combination * * *, or conspiracy, in restraint of trade * * *," to apply only to those restraints which are unreasonable as understood in the common law. When the criminal application of the Sherman Act was challenged, in *Nash v. United States,* 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232 (1912), on the ground that "the crime defined by the statute contains in its definition an element of degree as to which estimates may differ," Mr. Justice Holmes, speaking for the Court, said:

> But apart from the common law as to the restraint of trade thus taken up by the statute, the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. * * * We are of opinion that there is no constitutional difficulty in the way of enforcing the criminal part of the act.

229 U.S. at 378–79, 33 S.Ct. at 781. See also *United States v. Ragen,* 314 U.S. 513, 523–24, 62 S.Ct. 374, 86 L.Ed. 383 (1942). More recently, the Supreme Court upheld against a constitutional challenge a criminal proceeding under § 3 of the Robinson-Patman Act, 15 U.S.C., § 13a, which makes it a crime to sell goods at "unreasonably low prices for the purpose of destroying competition or eliminating a competitor." *United States v. National Dairy Corp.,* 372 U.S. 29, 34–36, 83 S.Ct. 594, 599, 9 L.Ed.2d 561 (1963).[20] We conclude, therefore, that the regulation, which permits "reasonable variations caused by loss or gain of moisture during the course of good distribution practices or by unavoidable deviations in good manufacturing practices," has not been shown by the parties claiming its invalidity to be impossible of application without depriving those to whom it is applied fair notice of the practices which are not within the permission of the regulation. The nature of the recognized variations is clearly set forth; Becker, Jones, and Christensen have not alleged that those subject to the regulation, such as Rath,[21] could not perceive the conditions under which the regulation would permit reasonable variations in weight to be recognized. The characterization of the recognized variations as "reasonable" is not constitutionally infirm in itself, as the cases show. Our conclusion is confirmed by the holding of the Supreme Court in *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), that Article 134 of the Uniform Code of Military Justice, which punishes "[a]ll disorders and neglect to prejudice of good order and discipline in the armed forces," is not void for vagueness. See also *Ricci v. United States,* 507 F.2d 1390 (Ct.Cl.1974). Application of the regulation, *as gauged on this record,* does not offend the due process clause of the 5th Amendment, as it has not been shown that the regulation fails to give fair notice of the variations to be permitted under it.

---

**20.** The Court did not uphold the statute on its face, but only as applied to the acts charged in the indictment. The Court did, however, distinguish the case from *United States v. Cohen Grocery Co.,* 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921), in which a statute proscribing "any unjust or unreasonable rate or charge" was invalidated. The Court saved § 3 by finding that the statute made clear reference to the nature of the conduct prohibited, i. e., that which was intended to destroy competition, etc. 372 U.S. at 35, 83 S.Ct. 594.

**21.** 9 CFR 302.1(a) provides:

> (a) Inspection under the regulations in this subchapter [which includes 317.2(h)(2)] is required at:
> (1) Every establishment * * * in which any products of * * * carcasses of livestock * * * are prepared for transportation or sale as articles of commerce, which are intended for use as human food.

The second prong of the district court's criticism of the regulation is that it constitutes an impermissible redelegation to USDA field inspectors of the authority granted by Congress to the Secretary to determine what variations caused by gain or loss of moisture, etc., were to be permitted. This conclusion is error, as the legislative history and precedent demonstrate.

In enacting the Wholesome Meat Act of 1967, Congress made additions to the statutory framework underlying federal meat inspection programs and standards. In particular, Congress created a series of definitions modeled on the definitions used in the Food, Drug, and Cosmetic Act, 21 U.S.C., § 301 et seq. In S.Rep. No.799, 90th Cong., 1st Sess.,[22] the Committee said with respect to Sec. 1(n) of S. 2147, which became 21 U.S.C., § 601(n), the statutory basis of the questioned regulation:

(n) *Misbranded.*—The definition of this term, not heretofore used in the Meat Inspection Act, is discussed in ·connection with section 12. It is based on the definition of the same term in the Federal Food, Drug, and Cosmetic Act and is identical except that—

In new section 1(n)(5) the introductory phrase is slightly different in that it refers to "other container" besides packages and requires a label "showing" rather than "containing" specified information; and in the proviso, reasonable variations and exemptions "may" instead of "shall" be allowed by the Secretary of Agriculture instead of the Secretary of Health, Education, and Welfare. Also an internal reference to a clause is made in different terms than in the Federal Food, Drug, and Cosmetic Act.

\* \* \* \* \* \*

It is therefore proper for us to consider the history and construction of the Food, Drug, and Cosmetic Act prior to 1967 in interpreting the scope of the Secretary's power to promulgate regulations.

In *United States v. Shreveport Grain & Elevator Co.,* 287 U.S. 77, 53 S.Ct. 42, 77 L.Ed. 175 (1932), the Supreme Court had occasion to construe the Food and Drug Act and regulations thereunder, as they were in force at that time. The relevant portion of the Act provided:

[A]n article of food shall be deemed to be misbranded—

Third. If in package form, the quantity of the contents be not plainly and conspicuously marked on the outside of the package in terms of weight, measure, or numerical count: *Provided, however,* That reasonable variations shall be permitted and tolerances and also exemptions as to small packages shall be established, by rules and regulations made in accordance with \* \* \* this Act.

The regulation stated:

(i) The following tolerances and variations from the quantity of the contents marked on the package shall be allowed:

(1) Discrepancies due exclusively to errors in weighing, measuring, or counting which occur in packing in compliance with good commercial practice.

\* \* \* \* \* \*

(3) Discrepancies in weight or measure, due exclusively to differences in atmospheric conditions in various places, and which unavoidably result from the ordinary and customary exposure of the packages to evaporation or to the absorption of water.

Discrepancies under classes (1) and (2) of this paragraph shall be as often above as below the marked quantity. The reasonableness of discrepancies under class (3) of this paragraph will be determined on the facts in each case.

The resemblance between the present statute and regulation and the statute and regulation in force in 1932 is apparent.

The Court held that the substantive standard created by the Act was that

22. 2 *U.S.Code Cong. and Admin.News,* 90th Cong., 1st Sess., pp. 2188–2213 (1967).

packages be marked plainly and conspicuously with their weights, and that the statutory proviso gave the involved Secretaries the administrative authority to permit reasonable variations from this hard and fast rule. The Court continued [287 U.S. at 84, 53 S.Ct. at 44]:

> Moreover, the practical and long continued construction of the executive departments charged with the administration of the act and with the duty of making the rules and regulations therein provided for, has been in accordance with the view we have expressed as to the meaning of the section under consideration. The rules and regulations, as amended on May 11, 1914, deal with the entire subject in detail under the recital, "(i) The following tolerances *and variations* [italics supplied] from the quantity of the contents marked on the package shall be allowed: . . . " Then follows an enumeration of discrepancies due to errors in weighing which occur in packing conducted in compliance with good commercial practice; due to differences in capacity of bottles and similar containers, resulting from unavoidable difficulties in manufacture, etc.; or in weight due to atmospheric differences in various places, etc. These regulations, which cover variations as well as tolerances and exemptions, have been in force for a period of more than eighteen years, with the silent acquiescence of Congress.

The Court did not question the authority of the Secretary to promulgate the regulation. In the forty-two years since the *Shreveport Grain* case Congress has not changed its delegation of authority to the Secretary to "permit reasonable variations," nor have the regulations promulgated expressly under that authority included any quantitative expressions of the variations to be permitted.

The question, therefore, is: Has the Secretary failed to heed the intent of Congress in giving him authority to permit reasonable variations by declining to put numerical limits on the variations he and his representatives will permit in the enforcement of the substantive standard of the Act? In the Food, Drug, and Cosmetic Act of 1938, 52 Stat. 1040, Congress reenacted the provisions of the prior Act in substantially identical terms to those before the Court in *Shreveport Grain*.[23] It has been held that Congress gives a regulation the force and effect of law by reenactment of the statutory provision to which it pertains. *Helvering v. R. J. Reynolds Tobacco Co.,* 306 U.S. 110, 59 S.Ct. 423, 83 L.Ed. 536 (1939). We note also the presumption that reenactment of a statutory provision by Congress without significant change indicates its approval of prior judicial interpretation of that provision. *United States v. Douglas Aircraft Co.,* 510 F.2d 1387 (CCPA 1975). Becker, Jones, and Christensen have adduced nothing to overcome the conclusion that the regulation is a valid exercise of the authority delegated to the Secretary by Congress. The regulation must be presumed valid, and the burden is on those contending its invalidity to persuade us otherwise. Forty-two years of Congressional silence is strong evidence that Congress has acquiesced in the Secretary's interpretation of the scope of his powers. See *Flood v. Kuhn,* 407 U.S. 258, 283, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). We do not, for the above reasons, concur in the district court's analysis of *Shreveport Grain,* and hold that the district court erred in finding 9 CFR 317.2(h)(2) invalid.

### III.

The central issue in this litigation is whether sections of the California

---

**23.** Sec. 403. A food shall be deemed misbranded—

(e) If in package form unless it bears a label containing * * * (2) an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count: *Provided,* That under clause (2) of this paragraph reasonable variations shall be permitted, and exemptions as to small packages shall be established by regulations prescribed by the Secretary.

statute and regulations promulgated thereunder are preempted by the Wholesome Meat Act of 1967 and 9 CFR 317.-2(h)(2). The district court based its holding of preemption on its finding that the statistical variations allowed by California from the accurate weight standard imposed by 21 U.S.C., § 601(n)(5), in the absence of valid regulations permitting reasonable variations thereunder, created a net weight labeling standard "different than" the federal standard. We agree with the holding, but not with the reasoning on which it was based.

"Our principal function is to determine whether, under the circumstances of this case [the state regulations and] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the Wholesome Meat Act and delegating to the Secretary the power to make regulations thereunder. *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). The inquiry in this case will follow the lines set forth in *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963):

> The principle to be derived from our decisions is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakenly so ordained.

21 U.S.C., § 678, was enacted as part of the Wholesome Meat Act of 1967, Pub.L. 90–201, § 408, 81 Stat. 600. We are of the opinion that in it "Congress has unmistakenly so ordained." Accord, *Armour and Company v. Ball,* 468 F.2d 76 (6th Cir. 1972). This conclusion follows from the clear language and legislative history of 21 U.S.C., § 678. The first part of the section reads in relevant part: ·

> Requirements within the scope of this chapter with respect to premises, facilities and operations of any establishment at which inspection is provided under subchapter I of this chapter, which are *in addition to, or different than those made under this chapter may not be imposed by any State* * * *, except that any such jurisdiction may impose record keeping and other requirements within the scope of section 642 of this title, if consistent therewith, with respect to any such establishment. Marking, *labeling,* packaging, or ingredient *requirements in addition to, or different than,* those made under this chapter may not be imposed by any State * * * with respect to articles prepared at any establishment under inspection in accordance with the requirements under subchapter I of this chapter * * *. [Emphasis added.]

The report of the Senate Committee, S.Rep.No.799, 90th Cong., 1st Sess., states: [24]

> The committee feels that Federal standards must be required of all meat and meat food products sold for human consumption in this country.
>
> * * * * * *
>
> However, the committee wants it clearly understood that the requirements on wholesomeness, additives, labeling, and the other Federal regulations are not to be compromised and must be at least equal to Federal standards.
>
> * * * * * *
>
> Section 408 [codified at 21 U.S.C. § 678] would exclude States * * * from imposing marking, labeling, packaging, or ingredient requirements in addition to or different than those under the Federal Meat Inspection Act for articles prepared in accordance with title I of the act * * *.

This language clearly shows the intent of Congress to create a uniform national labeling standard, under the definitions set forth in the Wholesome Meat Act, including the definition of "misbrand-

---

24. 2 *U.S.Code Cong. and Admin.News,* 90th Cong., 1st Sess., 2191, 2207 (1967).

ing" in § 601(n). The express language of § 678 implements this clear Congressional intent.

In the absence of regulations under the Act the statutory labeling [25] standard under the Act is that the label reflect "accurate" weight, as the district court held. 9 CFR 317.2(h)(2) adds to this federal standard the condition that "reasonable variations caused by loss or gain of moisture during the course of good distribution practices * * * will be recognized." The California statutes and regulations must impose such a standard of labeling on Rath or they are preempted by federal law as requiring weight information on labels "different than" that required by federal law.

Cal.Bus. and Prof.Code § 12211 establishes the following standard: "that the *average* weight or measure of the packages or containers in a lot of any such commodity sampled shall not be *less,* at the time of sale or offer for sale, than the net weight or measure stated upon the package." (Emphasis added.) This section also provides for the promulgation of regulations to govern the sampling and weighing procedures. The California regulations, the district court concluded, provide only for a statistical variation from the absolute accurate weight and make no reference to loss of moisture from the packages of bacon (or other products that lose moisture, for that matter) experienced between the time the bacon is weighed in the plant and the time that California inspectors weigh the bacon at the retail store. We agree with the district court that Cal. Bus. and Prof.Code § 12211 and 4 Cal. Admin.Code, ch. 8, subch. 2, Art. 5, impose labeling standards "different than" those under federal law and may not be enforced.

Jones, Becker, and Christensen claim that this holding infringes on the legitimate interests of the State of California protecting its citizens from short-weight meat products. We cannot agree. Christensen and Becker recognized the true situation in their brief: "Christensen and Becker submit that by [21 U.S.C., § 678] Congress sanctioned the adoption by the states of laws (statutes and regulations) which impose the same *standard* required by the Wholesome Meat Act * * * and which are enforced by means of state enforcement procedures." (Emphasis in original.) The concluding portion of § 678 reads in relevant part as follows:

> * * * but any State * * * may, consistent with the requirements under this chapter, exercise concurrent jurisdiction with the Secretary over articles required to be inspected under said subchapter I, for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded and are outside of such an establishment * * *. This chapter shall not preclude any State or Territory or the District of Columbia from making requirement or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter.

Our holding does not diminish the Congressional grant in § 678 to the States of enforcement jurisdiction concurrent with the Secretary over misbranded articles outside federally inspected establishments, *if the States do not impose labeling and other requirements "in addition to or different than" the federal standards when exercising their concurrent jurisdiction.* We have merely held that California cannot exercise its concurrent jurisdiction through the particular standards established by § 12211 and Art. 5. California is free to enact other statutes and regulations which do not offend § 678. It must be further understood that the only matters at issue are net weight labeling standards; our judgment herein does not

---

**25.** Jones' argument that California imposed no "labeling" requirements, but rather sought to prevent "misbranding" under Cal.Bus. and Prof.Code § 12211, is strained. 21 U.S.C. § 601(n) read as a whole, defines violation of its "labeling" requirements as "misbranding." As we hold below, the federal standards, which include definitions of terms, prevail over conflicting State standards.

pertain to other matters which are or may be regulated by the State of California.

## IV.

 Rath urges as error the holding of the district court that the federal net weight standard set by 21 U.S.C., § 601(n)(5), "can be applied to packages of meat or meat food products at the ultimate end of a meat processor's distribution system—the retail store." Implicit in this holding is that California may exercise the concurrent enforcement jurisdiction permitted it by 21 U.S.C., § 678, by the imposition of appropriate standards through the inspection of packages at the supermarket.

Rath's position is at odds with the intent of the Wholesome Meat Act and with the grant of concurrent enforcement jurisdiction to the States. 21 U.S.C., § 602, states that "It is essential in the public interest that the health and welfare of *consumers* be protected by assuring that meat and meat food products *distributed to them* are wholesome, not adulterated, and properly marked, labeled, and packaged." (Emphasis added.) 21 U.S.C., § 624, gives the Secretary the power to promulgate regulations governing the storage and handling of meat and meat food products "to assure that such articles will not be * * * misbranded *when delivered to the consumer.*" (Emphasis added.) The emphasized portions make it clear to us that Congress intended to continue the protection provided under the Wholesome Meat Act to the point at which the consumer receives the meat and meat food products subject to the Act, i. e., at the retail food store level.[26]

21 U.S.C., § 673(a) provides for federal seizure of misbranded meat and meat food products which are "held for sale [i. e., in a retail store] in the United States after * * * transportation [in commerce]," and § 673(b) indicates that federal seizure does not "derogate from authority for condemnation or seizure conferred by * * * other laws." The concurrent jurisdiction granted by 21 U.S.C., § 678, to enforce appropriate State standards outside of federally inspected establishments would be a nullity if it were to be construed to prevent State enforcement at a level of distribution which Congress clearly intended to be subject to *non*-exclusive federal regulation.

Rath, however, argues that the federal net weight standard requires that the label be accurate only when the product leaves the establishment, relying on 21 U.S.C., § 607(b).[27] Accordingly, says Rath, the State may not require conformance with the federal standard of accurate weight, with reasonable variations, etc., considered, past that point. Such an argument renders meaningless the allowance of reasonable variations for gain or loss of moisture *during the course of good distribution practices.* Why would the federal scheme consider distribution practices to be relevant at all if the federal net weight labeling standard applied only at the point at which distribution of the product commenced? We cannot attribute such a restrictive reading to § 607(b). Rath's objections are met by the reasonable variations allowance; whatever weight variation results from gain or loss of moisture occurring in the chain of distribution from packing plant to retail store *must,* under 9 CFR 317.2(h)(2), be taken into account in determining whether the net weight labeling of a package at retail complies with the federal standard.

## V.

 After the district court filed its order enjoining the enforcement of Cal.

---

**26.** See also, 9 CFR 317.2(b), promulgated under 21 U.S.C., § 601(n)(6), which provides in part:

> [Any label term must be] likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

**27.** "(b) All * * * meat and meat food products inspected at any establishment under the authority of this subchapter * * * shall *at the time they leave the establishment* bear * * * the information required under paragraph (n) of section 601 of this title." (Emphasis added.)

Bus. and Prof.Code § 12211 and 4 Cal. Admin.Code ch. 8, subch. 2, Art. 5, Christensen promulgated a new regulation, Art. 5.1, to

> * * * apply only during the proceedings [of the instant case]. This Article is adopted as a temporary authority to protect California wholesalers, retailers, and consumers against short weight packages of meat and meat products * * *.

The district court refused to modify its order to enjoin the enforcement of Art. 5.1 and Cal.Bus. and Prof.Code § 12607, the alleged statutory authority for the regulation. Rath requests us to enlarge the declaration and injunction to hold invalid and enjoin the enforcement of these provisions as well.[28]

§ 12607 provides:

> Whenever a consumer commodity is offered for sale, exposed for sale or sold without a statement of net quantity appearing thereon * * *, the sealer shall in writing order the commodity off sale and require that a correct statement of net quantity be placed on the commodity before the same may be released by the sealer.

This section, standing by itself, is innocuous if "net quantity" is a designation of contents by weight which is not "in addition to or different than" the federal net weight labeling requirements. Art. 5.1 shows that the interpretation of "net quantity" enforced in California is "different than" the federal standard:

> 2940.1. *Package Inspection.* (a) Each sealer of weights and measures shall, within his county, inspect packages of meat and meat products and poultry and poultry products to determine whether the label weight stated on the package is accurate at time of inspection.

> (b) The determination of accuracy shall be made by weighing all of the usable product within the container, exclusive of wrappers and packing substances.

> (c) As an alternate procedure to the procedure stated in subsection (b), the sealer of weights and measures shall establish an accurate tare weight for the containers within a lot of packages and weigh each of the inspected packages. He shall:

> > (1) Remove 3 packages from the lot at random and weigh each of the unopened packages;

> > (2) Remove from each of the 3 containers all of the usable product, exclusive of wrappers and packing substances; and

> > (3) Determine the tare weight for each of the 3 packages separately by subtracting the weight of the usable product from the gross weight.

> He shall weigh separately each of the packages in the lot to be inspected and apply as a tare weight for purposes of the lot the lowest tare weight obtained by the above procedure.

> (d) For purposes of the procedure specified in subsection (c), a lot is defined as a group of packages assembled in one place, of the same product and brand, in apparently identical containers, bearing the same statement of weight.

It is clear beyond cavil that Art. 5.1 makes *no* allowance for variations from accurate weight *whatever*. Since the federal standard, by virtue of 9 CFR 317.2(h)(2), requires recognition of reasonable variations due to gain or loss of moisture, etc., Art. 5.1 is preempted by the federal standard and may not be enforced. To the extent that § 12607 is interpreted to permit a definition of "net

---

**28.** Rath did not appeal separately from the denial of its motion to amend the judgment. The issue was preserved by Rath's initial notice of appeal, since the injunction granted by the district court was narrower in scope than the relief requested by Rath. Rath's notice of appeal specifically noted the limitation of relief. We also note that the district court, 357

F.Supp. at 533, relied on Becker, Jones, and Christensen's citation of § 12211 as the primary statutory authority in fashioning the remedy. By changing their statutory basis of authority, they scarcely should argue that Rath has the burden of foreseeing what regulations they will use next.

quantity" which does not recognize the reasonable variations allowed by the federal standard, it is likewise preempted and may not be enforced.[29] The applicability of Art. 5 only during the "proceedings" of this case does not deter us from considering its enforcement improper, since we have no control over the interpretation of its period of applicability either administratively or by a state court except by assuring by injunction that Art. 5.1 will not be enforced at all.

## VI.

### CONCLUSION

In recapitulation we hold:

(1) that the district court had jurisdiction over the subject matter of this case, personal jurisdiction being conceded;

(2) that the district court erred in invalidating 9 CFR 317.2(h)(2);

(3) that the Wholesome Meat Act of 1967, 21 U.S.C., § 601 et seq., and 9 CFR 317.2(h)(2) preempt Cal.Bus. and Prof.Code § 12211 and 4 Cal.Admin. Code ch. 8, subch. 2, Art. 5, and that Becker, Jones, and Christensen were properly enjoined from enforcing those sections;

(4) that the district court correctly held that state standards not in addition to or different than the federal net weight labeling standard may be enforced by appropriate State procedures at the retail level; and

(5) that 4 Cal.Admin.Code ch. 8, subch. 2, Art. 5.1, is preempted by federal law, that Cal.Bus. and Prof.Code § 12607 is preempted by federal law to the extent indicated in part V, supra,

and that their enforcement should be enjoined.

Accordingly, the judgment of the district court is affirmed in part, reversed in part, and the case is remanded for entry of an amended order in conformance with this opinion.

---

**29.** Section 12607 is not saved by Cal.Bus. and Prof.Code § 12613, which provides:

> If any provision of this chapter is less stringent or requires information different from any requirement of Section 4 of the act of Congress entitle[d] "Fair Packaging and Labeling Act" (P.L. 89–755; 80 Stat. 1296, 15 U.S.C. 1451–1461) or of any regulation promulgated pursuant to such act, the provision shall be inoperative to the extent that it is less stringent or requires information dif-

ferent from any such federal requirement, in which event each such federal requirement is a part of this chapter.

No California standard, even if of equal or greater stringency than the federal standard, may be enforced if it is *different* from the federal standard. As enforced in Art. 5.1, § 12607 is different from the Wholesome Meat Act standard, whether *less stringent or not*. The Fair Packaging and Labeling Act is, of course, not relevant to this case.