**COOK FAMILY FOODS, LTD.,**
a Nebraska corporation,
Plaintiff,

v.

**Henry J. VOSS, Director, California Department of Food & Agriculture; California Department of Food & Agriculture, a public agency of the State of California; Gerald Hanson, County Sealer of Weights and Measures, County of San Bernardino; and Kathleen Thuner, County Sealer of Weights and Measures, County of San Diego, Defendants.**

**No. SACV–90–140–AHS (RWR).**

United States District Court,
C.D. California.

July 15, 1991.

John Passarelli, Sandra D. Morar, McGrath, North, Mullin & Kratz, Omaha, Neb., Stephen P. Wiman, Sandra M. Kanter, Nossaman, Guthner, Knox & Elliott, Los Angeles, Cal., for plaintiff.

John Dratz, Jr., Deputy Atty. Gen., California Dept. of Justice, R. Mark Beesley, Deputy County Counsel, Office of County Counsel, San Diego, Cal., Alan L. Green, Deputy County Counsel, Office of County Counsel, San Bernardino, Cal., for defendants.

ORDER ADOPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

STOTLER, District Judge.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the Court has reviewed the First Amended Complaint, all of the records and files herein and the attached Reports and Recommendations of the Magistrate Judge. Objections to the Report and Recommendation have been filed herein. Having made a *de novo* determination of those portions of the Report and Recommendation to which objection has been made, the Court concurs with and adopts the findings and conclusions set forth therein, except as noted below.

IT IS THEREFORE ORDERED that the Plaintiff's Motion for Summary Judgment on the First and Second Claims for relief of the First Amended Complaint is GRANTED and Plaintiff is entitled to injunctive and declaratory relief as to those claims. Plaintiff's motion for summary judgment on the third claim for relief is DENIED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that a judgment and permanent injunction be, and is, granted and entered in favor of Plaintiff Cook, in the form and on the terms set forth on the separate Judgment and Permanent Injunction filed and entered concurrently with this Order, against Defendants Henry J. Voss, Director, California Department of Food and Agriculture; the California Department of Food and Agriculture; Gerald Hanson, County Sealer of Weights and Measures, County of San Bernardino; and Kathleen Thuner, County Sealer of Weights and Measures, County of San Diego (defendants).

IT IS FURTHER ORDERED that the parties submit additional points and authorities on the issue of any party's entitlement to attorney fees and the appropriate amount thereof. The Court *sua sponte* bifurcates the issue of attorney fees and

retains jurisdiction to rule upon this issue. The issue of attorney fees shall be heard in accordance with the scheduling order to be set by the Magistrate Judge to whom this remaining issue only is ordered recommitted.

IT IS FURTHER ORDERED that the Clerk shall serve forthwith a copy of this Order, the recommendations of the Magistrate Judge, and the Judgment and Permanent Injunction, by United States mail on counsel for the parties of record.

## JUDGMENT AND PERMANENT INJUNCTION

Pursuant to the Order of the Court adopting the recommendations of the United States Magistrate Judge,

IT IS ADJUDGED that Judgment be entered in favor of Plaintiff and against Defendants, Henry J. Voss, Director, California Department of Food & Agriculture; California Department of Food & Agriculture; Gerald Hanson, County Sealer of Weights and Measures, County of San Bernardino; and Kathleen Thuner, County Sealer of Weights and Measures, County of San Diego on Plaintiff's First and Second Claims for Relief.

IT IS FURTHER ORDERED, ADJUDGED, DECREED AND DECLARED that the wet tare method and procedures which Defendants use to test the weight of water added ham products which are packaged and labeled under the Federal Meat Inspection Act, as amended by the Wholesome Meat Act, 21 U.S.C. Section 601, *et seq.* ("FMIA"), and regulations promulgated thereunder,

(a) Violate, and are preempted by, the FMIA and said regulations;

(b) Deprive Plaintiff Cook of due process of law under the Fourteenth Amendment to the Constitution of the United States of America and 42 U.S.C. § 1983.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendants, and each of them, and their officers, agents, employees, representatives, and all persons acting in concert or participating with them, including but not limited to County Sealers of Weights and Measures within each county of the State of California, shall be and hereby are permanently enjoined and restrained from engaging in, committing, or performing, either directly or indirectly, by any means whatsoever, any of the following acts:

(a) Implementing, applying and using their current and existing wet tare regulations (Cal.Code of Regulations, title 4, div. 8, ch. 2, art. 5; title 4, ch. 9, subch. 11, art. 1 and 2, §§ 4600 *et seq.*), methods and procedures as to any water added ham products packaged and labeled under the FMIA and regulations promulgated thereunder;

(b) Implementing, applying and using any wet tare regulations, methods and procedures which do *not* provide for scientifically established express allowances for moisture loss occurring during good distribution practices in connection with water added ham products, until a gray area has been established for water added ham products in accordance with 9 C.F.R. § 317.19 (55 Fed.Reg. 49834); and

(c) Implementing, applying and using any regulations, methods and procedures which do not provide for uniform and consistent standards for moisture loss allowance throughout the State of California in connection with water added ham products;

IT IS FURTHER ADJUDGED THAT said Plaintiff recover its costs of suit jointly and severally from, and against, said Defendants;

IT IS FURTHER ADJUDGED THAT the Court bifurcates for determination the issue of attorney fees, any party's entitlement thereto, and amounts thereof, if any. The Court therefore retains jurisdiction to rule upon this issue.

JUDGMENT SHALL BE ENTERED FORTHWITH.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND FOR PERMANENT INJUNCTION

RONALD W. ROSE, United States Magistrate Judge.

This Report and Recommendation is submitted pursuant to the provisions of 28

U.S.C. § 636(b)(1)(B) and General Order 194 of the United States District Court for the Central District of California.

## BACKGROUND

Cook Family Foods, Ltd, [Plaintiff] initiated this case on March 2, 1990 by filing a complaint for declaratory and injunctive relief against the California Department of Food & Agriculture, Henry J. Voss—the director of the California Department of Food & Agriculture, Gerald Hanson—the County Sealer of Weights and Measures for San Bernardino, and Kathleen Thuner—the County Sealer of Weights and Measures for San Diego. A first amended complaint supplanted the initial complaint on September 24, 1990. Jurisdiction is based on 28 U.S.C. §§ 1331, 1337, and 1343.

Plaintiff asserts four claims: (1) a declaratory relief finding that Defendants' regulations and procedures violate and are preempted by federal law, thus having no effect as applied to Plaintiff's products; (2) a declaratory relief finding that Defendants' regulations and procedures violate due process; (3) a declaratory relief finding that Defendants' regulations and procedures impose an unconstitutional burden on interstate commerce; and, (4) injunctive relief prohibiting any and all Defendants from implementing or enforcing existing regulations and procedures.[1]

Plaintiff, in the motion at bar, seeks summary judgment on its claims, arguing that there are no genuine issues of material fact for trial and that its position must prevail as a matter of law.[2]

This case is the latest in a series between meat producers and California regulators.

A similar case has been decided by the United States Supreme Court and is relied on and compared extensively in this analysis. *See Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). It involved a bacon packing company, state and county regulators, and applicable state and federal laws.

The case at bar involves a ham producer, state and county regulators, and essentially the same state and federal laws.[3]

## STATEMENT OF FACTS

The following facts are gleaned from Plaintiff's statement of facts, incorporated in part by opposing Defendants.[4]

Plaintiff is a Nebraska corporation that processes cured pork products at a plant in Lincoln, Nebraska. This plant processes a number of products, including ham water added—shank portions and ham water added—butt portions. After processing, these products are sold and shipped to retail and wholesale distributors throughout California, including Lucky Stores, Inc. [Lucky's].

Plaintiff's Lincoln plant [plant] is a federally inspected establishment subject to the applicable requirements of the Federal Meat Inspection Act [FMIA], and regulations promulgated thereunder by the United States Secretary of Agriculture [Secretary] and the United States Department of Agriculture [USDA]. *See, e.g.*, 9 C.F.R. §§ 301 *et seq.* (1989), as amended at 55 Fed.Reg. 49826 (1990) [USDA Regulations]. The USDA Regulations govern in detail the manner in which Plaintiff processes, packages, weights, and labels its cured pork products. The Food Safety and Inspection Service [FSIS] of the USDA implements

---

1. First Amended Complaint 7–17.

2. Defendants also ask the Court for summary judgment in their Opposition. (Opposition, 31:8–11, 33:6–14). Defendants have filed no Motion for Summary Judgment and are referred to Fed.R.Civ.P. Rule 56 for the proper procedure to follow when seeking Summary Judgment.

3. The state law has been recently modified in an apparent attempt to comport with the holding in *Rath, supra.* The federal law has been recently modified to provide more uniformity.

4. Prior to the hearing, Defendant Gerald Hanson joined with Defendant Harold J. Voss in opposition to Plaintiff's motion. However, Defendant Harold J. Voss had not filed any opposition to this motion. Therefore, those two Defendants did *not* oppose the motion.

At the time of oral argument, and without objection, Defendant Voss was permitted to join in the California Department of Food & Agriculture's opposition to the motion. Defendant Hanson's joinder in Voss' opposition is, thus, also now procedurally correct.

and enforces the regulations. As is required under the FMIA for any facility that processes meat and meat food products for distribution in interstate commerce, plaintiff's Lincoln, Nebraska processing facility maintains a grant of inspection from the FSIS as official establishment 509L, which Plaintiff received on February 5, 1986. (21 U.S.C. §§ 603–624; 9 C.F.R. §§ 302.1–305.61 (1989)).

Under 9 C.F.R. § 318.4 (1989), federally inspected facilities may establish a plant-operated quality control program for particular products or operations (partial quality control, or PQC). Each program is designed to ensure that the operations covered by the program are adequate to result in the product complying with the requirements of the FMIA and USDA Regulations.

Plaintiff's plant operates under a quality control program specifically designed for each type of cured pork product that it produces. As required by 9 C.F.R. § 318.-4(e)(1) (1989), Plaintiff's program for net weight control and labeling of its products at the plant was approved by the Administrator of FSIS on March 3, 1986. Such approval means that the FSIS has evaluated this PQC program and determined that Cook product labels accurately reflect the net weight of the company's cured pork products in accordance with FMIA and USDA Regulations. (9 C.F.R. § 318.4(e) (1989)). Even with a PQC program in place, the FSIS continues to monitor and inspect the plant in accordance with the requirements of the FMIA and USDA Regulations. (9 C.F.R. § 318.4(e)(3) (1989)). The USDA must approve all of plaintiff's labels prior to use and has done so.

Plaintiff's cured pork products have substances, including water, added to them as part of the curing process. The added substances contained in cured pork products are regulated by the FSIS. USDA Regulations contemplate that water will be part of the weight of the product.[5] With cured pork products, it is unavoidable that some of the added liquid, mixed with natural juices, will "purge" from the solid product after packaging and during the distribution process.[6] In Plaintiff's products, purge is the liquid found in the cryovac bag and the liquid which is absorbed by the packaging materials in which the product is held.[7]

In its Meat and Poultry Inspection Manual [FSIS Inspection Manual], FSIS requires that all federally inspected meat products be weighed and labeled at the plant using dry tare procedures.[8]

By contrast, California's County Sealers interpret California's regulations for inspection of meat, California Code of Regulations, title 4, div. 8, ch. 2, art. 5 [Article 5], as requiring that all cured pork products, *including federally inspected cured pork products,* be weighed using wet tare procedures. Accordingly, if packages are accurately weighed at Plaintiff's plant in Nebraska in accordance with USDA dry tare procedures, it is likely that the same packages will weigh somewhat less when weighed at the point of sale in California

---

**5.** 9 C.F.R. § 319.104 (1989); Declaration of Mahlon A. Burnette, III, [Burnette Decl.] 4:27–28, 5:1–6.

**6.** *Id.* at 5:10–14.

**7.** *Id.* at 5:14–18.

**8.** Two methods of measuring the net weight of a product are relevant to this case—"dry tare" (also sometimes referred to as "unused tare") procedures and "wet tare" procedures. "Tare" is the packaging container or vehicle in which a product is held. Under a dry tare procedure, the tare weight is determined based upon the weight of unused tare material. The tare weight is then subtracted from the gross wrapped package weight in order to determine the net weight of the product. Accordingly, dry tare proce-dures include as part of the net product weight any purge that may either be free flowing within the package or may be adhering to or have been absorbed into the packaging material, as well as fat and meat particles that may be adhering to the packaging materials.

Under wet tare procedures, all purge which is adhering to or has been absorbed into the packaging materials, and free flowing liquid as well, is considered to be part of the tare weight and accordingly not a part of the net product weight. The results found in wet tare procedures are also significantly affected by the fact that fat and solid particles which have adhered to the packaging material are treated as tare. (Burnette Decl., 6:4–10).

using a wet tare procedure.[9] The difference in weight is mainly caused by the natural and unavoidable purging of liquid from the solid product and to a lesser extent by the separation of fat and meat particles from the solid product.[10]

*County sealers*

Defendant Kathleen Thuner is the County Sealer of Weights and Measures of the County of San Diego.[11] Defendant Gerald Hanson is the County Sealer of Weights and Measures of the County of San Bernardino.[12] Under the authority of §§ 12103.5 and 12211 of the California Business and Professions Code, these County Sealers, through their employees and representatives, regularly conduct tests of weights and measures of packaged commodities at retail locations in their respective counties. Pursuant to § 12211, these tests are conducted in accordance with Article 5 in order to determine whether the tested packages actually contain the quantity or amount of the tested product represented.

*San Diego inspections*

On December 20, 1989, at a Lucky's located in El Cajon, California, Defendant Kathleen Thuner, through her representative Jeff Kushman, tested samples of Plaintiff's ham water added—shank portions and ham water added—butt portions, using wet tare procedures.[13]

Mr. Kushman permitted a one percent (1%) variance in the actual weight from the net weight declared on the package labels; this variance was intended to allow for loss of moisture (purge) during product distribution.[14] The one percent moisture loss allowance was based on his general experience with water added ham products.[15] Plaintiff's products were found to be labeled inaccurately and eighteen (18) pounds of ham water added—shank portions of thirty-five (35) pounds of ham water added—butt portions were removed and prohibited from sale [off sale].[16]

On December 20, 1989, Mr. Kushman followed the same test procedures at another Lucky's and again found samples of Plaintiff's products to be inaccurately labeled.[17] Based upon the sample, seventy-two (72) pounds of ham water added—shank portions were ordered off sale.[18]

*San Bernardino inspections*

On December 22, 1989, Defendant Gerald Hanson, through his representative Janice Dickerson, tested samples of Plaintiff's products at a Lucky's located in San Bernardino, California.[19] Ms. Dickerson used wet tare testing procedures.[20]

She also permitted a one percent (1%) moisture loss allowance.[21] She used the one percent figure based upon her judgment that it was fair, after a discussion with Mr. Kushman disclosed that he had used the same allowance two days earlier.[22]

Ms. Dickerson found Plaintiff's products to be labeled inaccurately and three hundred and sixty-nine (369) pounds of products were held off sale.[23]

On December 27, 1989, Ms. Dickerson tested samples of Plaintiff's products, this time at a Lucky's in Ontario, California.[24]

**9.** *Id.* at 6:1–4.

**10.** *Id.* at 6:4–7.

**11.** Answer of Defendant Kathleen Thuner to Original Complaint, 2:13–15.

**12.** Hanson Answer.

**13.** Kushman Deposition [Kushman Depo.], 42:8–29, 43:1–28, 44:1–14, Exhibit 11–3.

**14.** *Id.* at 44:15–24.

**15.** *Id.* at 26:9–28, 27:1–2, 44:25–28, 45:1–16.

**16.** *Id.* at Exhibit 11–3.

**17.** *Id.* at 47:14–28, 48:1–28, 49:1–28, 50:1–18, Exhibits 12–2, 12–3.

**18.** *Id.* at Exhibits 12–2, 12–3.

**19.** Dickerson Deposition [Dickerson Depo.], 39:20–26, 40:1–24.

**20.** Hanson Answer.

**21.** Dickerson Depo., 27:16–19, 28:11–15, 31:25–26, 32:1–19.

**22.** *Id.* at 28:16–26, 29:1–26, 30:1–26.

**23.** Hanson Answer, no denial of para. 15 of amended complaint.

**24.** Dickerson Depo., 39:20–26, 40:1–20, 41:4–10.

Again, she found the products to be incorrectly labeled and one hundred and eighty (180) pounds of ham water added—shank portions and one hundred and forty (140) pounds of ham water added—butt portions were held off sale.[25]

## STANDARDS FOR MOTIONS FOR SUMMARY JUDGMENT

A motion for summary judgment pursuant to Fed.R.Civ.P. 56 is designed to pierce the allegations in the pleadings and determine whether any factual issues need to be tried. Rule 56 allows any party to a civil action to move for a summary judgment upon a claim, counterclaim, or cross-claim as to which there is no genuine issue of material fact and upon which the moving party prevails as a matter of law. 10 *C. Wright, A. Miller & M. Kane, Federal Practice and Procedure*, §§ 2711–2712 (Second Edition 1983 & Supp.1990) [hereafter *Wright, Miller & Kane*]. Summary judgment shall be rendered for the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court shall consider all admissible affidavits and supplemental documents on a motion for summary judgment. *See Connick v. Teachers Ins. and Annuity Ass'n*, 784 F.2d 1018, 1020 (9th Cir.1986).

Once a properly pleaded and supported motion for summary judgment is made, the opposing party must set forth, by affidavit or as otherwise provided in Rule 56, *specific facts* showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e) (emphasis added). The opposing party may not rely upon the mere allegations or denials of his pleadings in order to preclude summary judgment. *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1692–1693, 20 L.Ed.2d 569 & n. 19 (1968). He must produce at least some "significant probative evidence tending to support the complaint." *Id.* at 290, 88 S.Ct. at 1593. If

he does not so respond, summary judgment, if appropriate, shall be entered against him. Fed.R.Civ.P. 56(e); *Wright, Miller & Kane*, §§ 2738–2739.

In opposing a motion for summary judgment, the *non-movant* must show a genuine issue of material fact with evidence which is *relevant* to that element of the non-movant's case which is allegedly in dispute. "[I]f the factual context renders [the non-moving party's] claims implausible—if the claim is one that simply makes no economic sense—[the non-moving party] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Supreme Court required more than mere "metaphysical" doubt as to a genuine issue of material fact. *Id.* at 586, 106 S.Ct. at 1356.

In reviewing the standard of evidence in a motion for summary judgment, the Court must use the same substantive standard as applies to the case in chief. The governing standard sets forth, "... which facts are critical and which facts are irrelevant." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The issue in ruling on a motion for summary judgment is whether the evidence presented is such that a jury applying that evidentiary standard could *reasonably* find for either the plaintiff or the defendant. *Id.*

In determining whether a dispute is genuine, the court is not charged by Fed.R.Civ.P. 56 with drawing all inferences against the moving party, but only the reasonable inferences, i.e., where, on the evidence offered, a reasonable fact finder would be permitted to draw an inference adverse to the moving party. Schwarzer, *Summary Judgment Under the Federal Rules*, 99 F.R.D. 486 (1984), cited in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

---

**25.** Hanson Answer, no denial of para. 16 of    amended complaint.

## ISSUES PRESENTED

1. Whether Defendants' wet tare regulations and procedures violate the FMIA.[26]

2. Whether Defendants' wet tare regulations and procedures violate the due process clause of the fifth and fourteenth amendments to the United States Constitution, Article 1, § 7 of the California Constitution, and 42 U.S.C. § 1983.[27]

3. Whether Defendants' wet tare regulations and procedures impose an unconstitutional burden on interstate commerce.[28]

4. Whether, if the Court determines the validity of one or more of the first three claims, an injunction should issue against Defendants.

## DISCUSSION

### I. *Mootness*

■ Although not raised in the Motion for Summary Judgment, Defendants argue that the claims are moot. Defendants assert that the proposed California regulations now require inspectors to include reasonable moisture loss in the computation of product weight and therefore comport with requirements set forth in *Rath*. Defendants contend, as well, that they were already applying the new standards before the regulation was adopted.[29] These standards, found in the California Division of Measurement Standards [DMS] Procedure Manual, provide essentially what the newly adopted regulations provide; that is, discretionary determination of reasonable moisture loss by inspectors in the field. It is this unfettered application which Plaintiff contests. Therefore, the conduct sued upon remains essentially the same. Statutory changes which fail to modify the challenged conduct do not moot the litigation. *See Larry P. v. Riles*, 793 F.2d 969 (9th Cir.1984).[30]

### II. *Pre-emption*—(First claim for relief)

■ To decide whether state law is pre-empted, the Court must look to the circumstances of the individual case and determine whether the state law is an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). The Court considers the "relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Rath, supra*, 430 U.S. at 526, 97 S.Ct. at 1310, 51 L.Ed.2d 604.

Plaintiff first argues that California's regulations and the procedures relied on by the state in rejecting the products are inconsistent with, and therefore pre-empted by, federal law.[31] Defendants contend that newly promulgated federal and state regulations expressly allow state determination of moisture loss allowance using the wet tare method and therefore their regulations do not violate the FMIA.

The Supreme Court, in *Rath, supra*, reviewed the applicable federal and state regulations and determined that then existing California regulations and procedures were pre-empted.

In the case at bar, Defendants argue that the Director of Food and Agriculture has adopted new regulations effective January 20, 1991, that are consistent with the holding in *Rath* and furthermore, that although previous regulations did not address the subject of moisture loss (and therefore likely did not comport with *Rath*), county sealers were nonetheless applying the *Rath* guidelines through the use of the Quantity Control Procedure Manual [DMS Procedure Manual].

In *Rath, supra*, the defendant produced bacon at a plant subject to federal inspection under the FMIA, and transported and sold the finished product in California. The case sought declaratory relief to solve

---

**26.** First Amended Complaint.

**27.** *Id.*

**28.** *Id.*

**29.** Opposition, 17.

**30.** Defendants submitted on this point at oral argument.

**31.** Memorandum in Support of Summary Judgment Motion, 18.

a conflict between federal and state labeling requirements. In essence, the same laws, slightly modified, are in question in the case at bar.

### A. *Federal law*

The controlling federal law in *Rath, supra,* and in the instant case, is §7(b) of the FMIA, 81 Stat. 588, 21 U.S.C. § 607(b), which requires:

> All ... meat and meat food products inspected at any establishment under the authority of this title ... shall at the time they leave the establishment bear ... the information required under paragraph (n) of section 601 of this title.

Paragraph (n) defines a product as "misbranded" in the following relevant circumstances:

> (1) if its labeling is false or misleading in any particular;
>
> \*  \*  \*  \*  \*  \*
>
> (5) if [it is] in a package or other container unless it bears a label showing ... (B) an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count: *Provided,* That ... reasonable variations may be permitted ... by regulations prescribed by the Secretary.

At the time of *Rath, supra,* the Secretary provided regulations allowing reasonable variations. In pertinent part, the regulation reads as follows:

> The statement [of net quantity of contents] as it is shown on a label shall not be false or misleading and shall express an accurate statement of the quantity of contents of the container exclusive of wrappers and packing substances. *Rea-*

*sonable variations caused by loss or gain of moisture during the course of good distribution practices or by unavoidable deviations in good manufacturing practice will be recognized.* Variations from stated quantity of contents shall not be unreasonably large. (Former 9 C.F.R. § 317.2(h)(2) (1976) (Emphasis added)).[32]

Finally, pre-emption of state law was expressly provided by 21 U.S.C. § 678 which prohibits the imposition of "[m]arking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under" the Act.

### B. *State law*

The applicable and ultimately pre-empted state law in *Rath, supra,* was § 12211 of the California Business & Professions Code, which established the following standard:

> [T]he average weight or measure of the packages or containers in a lot of any ... commodity sampled *shall not be less,* at the time of sale or offer for sale, *than the net weight or measure stated upon the package ...*

Cal.Bus. & Prof.Code § 12211 (West Supp. 1977) (Emphasis added).

In application, California inspectors then follow the statistical sampling procedure established in Article 5 regulations. This results in their using wet tare test procedures for the products in question. In using the wet tare method, inspectors determine the tare weight by weighing the used, empty container from which all the usable net contents have been removed. (Cal.Code of Regulations, title 4, art. 5, § 2933.3.5(a)). In practice, the inspectors

---

**32.** This Code section has been amended on November 30, 1990, effective six months after publication. The newly modified 9 C.F.R. § 317.2(h)(2) reads as follows:

> The statement [of net quantity of contents] as it is shown on a label shall not be false or misleading and shall express an accurate statement of the quantity of contents of the container. Reasonable variations caused by loss or gain of moisture during the course of good distribution practices or by unavoidable deviations in good manufacturing practice will be recognized. ~~Variations from stated~~ ~~quantity of contents shall not be unreasonably~~ ~~large.~~ **Variations from stated quantity of contents shall be as provided in § 317.19. The statement shall not include any term qualifying a unit of weight, measure, or count such as "jumbo quart," "full gallon," "giant quart," "when packed," "minimum," or words of similar importance.** (Old language struckout, new language in bold).

To determine the reasonable variation allowed, § 317.19 directs the reader to the National Bureau of Standards' Handbook 133. (55 Fed.Reg. 49826, 49834).

include within the tare weight the packaging materials, all liquid absorbed by those materials, and all free-flowing liquid enclosed in the package. In fact, some inspectors simply weigh the enclosed product, remove the net usable product from the package and weigh the product. The weight of the usable product is then subtracted from the gross weight to determine the wet tare weight.[33] In California, the weight of the net usable product must conform to the net weight indicated on the package. No provision was allowed for moisture loss that typically occurred during distribution.

The Supreme Court found that the state requirements, in not allowing for reasonable moisture loss, were "different than" the federal requirements and therefore were pre-empted. *Rath, supra,* 430 U.S. at 532, 97 S.Ct. at 1313, 51 L.Ed.2d 604. Following this decision, California has attempted to regulate manufacturers net weight listings using the wet tare technique and still comply with *Rath.* Through Cal.Code of Reg., title 4, § 4650, effective January 20, 1991, California has created a procedure to be used on products such as those in dispute:

When used on commodities that are subject to moisture loss consideration during distribution, *reasonable moisture loss allowances or · applicable established gray areas must be considered* before an enforcement decision is made.[34]

Gray areas are established for flour, poultry, franks/hot dogs, bacon, sausage and luncheon meats. (Proposed Cal.Code of Reg., title 5, figure 1). There are no established gray areas for the products in question; therefore, inspectors would use reasonable moisture loss allowances. The standards, or lack thereof, used in the computation of a reasonable moisture loss allowance presents the issue in the case at bar. The essential issue is this, "what is reasonable and how is it applied?"

The Division of Measurement Standards, part of the California Department of Food and Agriculture, has published the DMS Procedure Manual which describes procedures to use in determining reasonable moisture loss allowance. An inspector proceeds as follows:

Upon determination that a particular lot of a commodity is subject to an allowance for moisture loss, weights and measures *officials should use discretion based upon prior knowledge and data to arrive at a "reasonable" value to be allowed.*[35]

Defendants note that many factors are considered when determining whether to allow a moisture loss allowance and, if allowed, how much allowance to give.[36] The temperature at which the product is kept during distribution and the amount of time spent in distribution are factors.[37] Comparing like products at the time of inspection, or historically, is a factor, as well as the type of packaging enclosing the product.[38] "Further, *the experience of the individual inspector* is an overall factor that is taken into consideration." [39]

California applies no consistent standard as to reasonable moisture loss. It relies upon the individual inspector's *subjective* experience and discretion with respect to permitting a moisture loss allowance at all and/or determining the appropriate percentage of allowance.[40]

Defendants agree that testing is possible to create scientifically determined guidance as to what moisture loss allowance should be applied. However, no such guidance is given inspectors; neither California nor its

---

**33.** Delperdang Deposition [Delperdang Depo.], 72:10–16.

**34.** Wiman Decl., Exhibit N (Emphasis added).

**35.** Kushman Depo., Exhibit A (DMS Procedure Manual, 195) (Emphasis added).

**36.** Delperdang Declaration in Support of Opposition [Delperdang Decl.], 3:23–28, 4:1.

**37.** *Id.* at 4:9–27.

**38.** *Id.* at 5:1–24.

**39.** Opposition, 25; Delperdang Decl., 5:18–24 (Emphasis added).

**40.** Delperdang Depo., 23:18–25, 24:1–25, 25:1–3, 35:16–25, 36:1–19, 37:13–25, 41:8–21, 51:23–25, 52:1–17; Dickerson Depo. 27:16–19, 28:11–15, 31:26–26, 32:1–19.

counties have conducted any test to establish guidelines to be used in reaching a reasonable percentage for moisture loss allowance.[41]

The Court, in *Rath, supra,* held that state law was preempted because it provided for no moisture loss during the course of good distribution practice. In analyzing the newly adopted regulations, California is attempting to require inspectors to allow for reasonable moisture loss. *See* Proposed Cal.Code of Reg., title 4, § 4650, *supra.* In practice, however, California has done nothing to *require* a reasonable moisture loss. By leaving the determination of reasonable moisture loss allowance to the discretion of individual field inspectors, California law has created a mishmash of "standards" so vague and arbitrary that it amounts to no effective standard at all. The permitted reasonable moisture loss may be no moisture loss at all and this is what *Rath, supra,* sought to prevent. In other words, during any given inspection, an inspector could determine, based on his experience, that no moisture loss should be allowed.

In the preamble to 9 C.F.R. Parts 317 and 381, 55 Fed.Reg. 49827, the FSIS, in remarking on the soon to be adopted federal regulations, noted that the revised regulations would serve several purposes, one of which would be to "enable Federal, State, and local regulatory agencies to enforce *uniform* net weight standards at retail and other locations within their jurisdictions where meat and poultry products are sold." (*Id.*). In response to a comment about pre-emption, the FSIS noted that,

[w]hile the [new] rule emphasizes concurrent jurisdiction with State and local authorities ..., Federal law prevails. Participating State and local officials must use only Federal law and rules.

(55 Fed.Reg. 49830).

Although the new California regulation apparently provides for reasonable mois-

ture loss allowance, in its application the field inspectors are not required to do so. They may or may not, depending on their analysis of various factors. *See due process, infra.* The language of the federal regulation is explicit, "reasonable variations ... *will* be recognized." 9 C.F.R. § 317.2(h)(2). Therefore, the state law is an obstacle to the execution of the full purposes and objectives that Congress sought in approving the federal legislation and, as such, is preempted.[42]

### III. *Due process*—(Second claim for relief) [43]

Plaintiff argues that giving field inspectors the discretion to determine the standards to use in allowing a reasonable moisture loss violates due process under the Fifth and Fourteenth Amendments of the Constitution. Defendants agree that a statute which "forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law" and is void. *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Defendants also agree that 42 U.S.C. § 1983 is broad enough to include them within its purview.[44] They argue, however, that the lack of numerical standards for determining moisture loss does not necessarily mean the proscribed method of calculating the loss is unconstitutionally vague.

The Supreme Court noted that a statute is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). First, the law must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act

---

**41.** Dickerson Depo., 31:11–13; Guensler Depo., 33:18–26, 34:1–16; Kushman Depo., 26:9–28, 27:1–2.

**42.** Defendants submitted on this point at oral argument.

**43.** This argument was the only issue in dispute at the hearing. The parties submitted on the Court's tentative recommendation, as reflected herein, on all other points.

**44.** Opposition, 23.

accordingly." *Id.* Second, to prevent arbitrary and discriminatory enforcement, "laws must provide explicit standards for those who apply them." *Id.* The hazards of vagueness lie in the law impermissibly delegating "basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." *Id.* at 109, 92 S.Ct. at 2299, 33 L.Ed.2d 222. "Although economic regulation is subject to a less strict vagueness test than criminal laws, vagueness analysis still applies to such regulations." *Chalmers v. Los Angeles,* 762 F.2d 753, 757 (9th Cir.1985) (Citations omitted). The principle inquiry is whether the law provides fair warning of what is proscribed. *Id.*

Plaintiff first challenges the statute as vague and void on its face. In *Rath Packing Co. v. Becker,* 530 F.2d 1295 (9th Cir. 1975), the court noted that in the absence of evidence of how the challenged statute was applied, the burden rested on those challenging the statute to show that the regulation was incapable of setting a standard of enforcement on its face. *Id.* at 1309. In the case at bar, Plaintiff presents evidence, in the form of testimony of county inspectors, as to application of the standard. Mr. Kushman, the San Diego Agriculture Standards Inspector III, in responding to Plaintiff's counsel, testified as follows:

Q: Is there, to your knowledge, any fixed standard of moisture loss that is used with respect to ham butt or ham shank products?

Ms. Bardsley (Defendants' counsel): Are you talking about a state standard?

Mr. Wiman (Plaintiff's counsel): Any standard.

A: *None.*

Q: Have you ever conducted any testing as to the moisture loss of a ham butt or ham shank product?

\*   \*   \*   \*   \*   \*

A. Do you mean the scientific test, the field test or what?

Q: Any kind of test.

A: *None. There was no scientific test or actual guidelines.* The product has to be stripped down. It is a field test.

Q: When you say "field test," how do you field test for moisture loss, if you do?

A: I *consider* a moisture loss on the— on the hams out in the field.

Q: That is measured in percentage; is that correct?

A: Yes.

Q: A percentage of what?

A: A percentage of the given weight statement on the product.

Q: On the product package?

A: Correct.

Q: How do you determine that percentage?

A: *It is based on eleven years of experience and how wet the product is.*

Q: How do you determine how wet the product is?

A: The variance between the given weight statement and the actual weight of the product *and through several, eleven years of experience, I make a determination of the moisture allowance, if any is given.*

Q: Referring to ham, pork and ham butt products, do you always give a moisture loss allowance to those products?

A: If it has a U.S.D.A. inspection label on it and coming from a U.S.D.A. inspected plant, I definitely *consider* a moisture allowance.

Q: You consider it. Do you always give a moisture loss allowance?

A: I always have in the past.

Q: What percentage or percentages have you given?

A: Oh, half a percent on some products up to one percent on some.

\*   \*   \*   \*   \*   \*

Q: How would you determine to give a certain percentage in one case and a certain percentage in a different case?

A: *Based on experience, I would give most of the time the higher percent to give the company a break,* in the actual weight statement, the variance between

the net weight and the stated weight versus the stripped down weight.

\* \* \* \* \* \*

Q: Could you give me an example— could you give me an example of how you would apply or how you would calculate the different percentages for moisture loss?

A: How would I calculate it?

Q: However you would determine it, on the same ham shank product.

A: A particular product? *There is no stated moisture number that I would give it. It would be anywhere from half a percent to one percent and a gross weight scenario, it may be zero percent.*

\* \* \* \* \* \*

Q: Okay. Thanks. I think I asked this, but let me make sure it is on the record.

So far as you are aware, there is no standard that sets forth the amount of moisture loss allowance one is to apply to a ham product; is that correct?

A: That's correct.[45]

A somewhat similar exchange occurred between Mr. Wiman and Janice Dickerson, the San Bernardino inspector.

Q: I'd like you to try to clarify as best you can how you selected one percent as being a reasonable standard based on your experience. *What in your experience led you to the conclusion that one percent is a reasonable moisture loss?*

A: *Because of all the years I've spent working with hams* as a meat cutter, meat wrapper, and an inspector for the county. I've opened lots of packages of hams, and hams normally do not lose a lot of moisture. *I've never done any studies on it, but I think one percent would be a fair moisture loss allowance based on my experience.*

\* \* \* \* \* \*

Q: I'm not trying to argue with you. I'm trying to understand as specifically as possible how you come to the conclusion of one percent.

Hams do not lose a lot of moisture, but how do you come to the conclusion that what moisture water-added do lose is one percent as opposed to two percent or three percent.

A: *In my judgment it's one percent.*[46]

Defendants insist that the inspector's judgment is based on a variety of factors, including the distribution time and temperature, the type packaging, and comparable product's moisture loss.[47] When asked to quantify the impact these factors have, one employee who trains inspectors had difficulty. Marianne Delperdang trained Janice Dickerson in meat inspection.[48] She testified as follows:

Q: Are you familiar with the term "moisture loss allowance?"

A: Yes, I am.

Q: Would you describe your understanding of that term.

A: The moisture loss allowance is—it is a determination that each inspector makes for federally inspected products where distribution has occurred and the product was labeled in the U.S.D.A. plant, and the moisture loss allowance is the allowance we give for fair distribution.

Q: *Do you provide any training with respect to moisture loss allowance?*

A: *No.*

Q: *Is there some reason that you do not?*

A: *There are no set standards to train for.*

\* \* \* \* \* \*

Q: As I understand it from your testimony and the testimony of the other deponents, *to determine as to whether to give a moisture loss allowance, and if so, how much of a moisture loss allowance, is something that is within the discretion of the particular field in-*

---

**45.** Kushman Depo., 26:1–10, 26:25–28, 27:1–28, 28:1–6, 28:24–28, 29:1–3, 30:11–20, 42:2–7 (Emphasis added).

**46.** Dickerson Depo., 31:25–26, 32:1–8, 32:13–19 (Emphasis added).

**47.** Opposition, 24.

**48.** Dickerson Depo., 13:6–9.

*spector at the time of conducting the test at the moment of testing; is that correct and accurate?*

A: *Yes.*

\* \* \* \* \* \*

Q: Consciously you don't assign any particular value to any particular criteria? You take all of the criterion [sic] into consideration, think about it, and then come up with the percent that you think, in your discretion, is fair; is that correct?

A: Correct. It is not unreasonably large.

Q: But how do you determine whether something is unreasonably large?

\* \* \* \* \* \*

A: Rath states that we should give a moisture loss, but at no time should it be unreasonably large. *If it is what I—I don't know. It is what I would consider to be too much.*[49]

Defendants contend that the lack of numerical standards do not violate due process. In fact, they argue, setting a firm number for moisture loss would itself be arbitrary.[50] The evidence presented is unconvincing. Normal moisture loss can be determined by scientific methods.[51] Defendants agree that testing is available to create scientifically determined guidance as to what moisture loss allowance should be applied.[52] That quantified scientific amount, determined by considering all of the various factors, including the type product, would not be arbitrary. Relying on a value determined by an inspector's varied experience level is fundamentally arbitrary, notwithstanding the inspector's good intentions or desire to be fair.

Next, Defendants argue that the federal guidelines, like the new state regulations, provide for the recognition of a "gray area" and therefore implicitly allow discre-tion.[53] The Court agrees that a gray area is recognized in 9 C.F.R. § 317.2. That section directs the reader to the National Bureau of Standards' [NBS] Handbook 133. (9 C.F.R. § 317.19). The NBS Handbook defines standards. For example, for poultry, the size of the gray area is set at 3%. If an examined product is within the gray area, the inspector is directed to follow specific procedures.

In the instant case, no such standard is provided. Each inspector is expected to develop his own standard on a case by case, product by product, day by day basis, relying on his own experience.

The testimony in the above depositions is quite clear. The inspectors cannot describe with any certainty what standards they use to make that crucial judgment. The application of reasonable moisture loss allowance and the quantification of the allowable amount itself is based on their different and varied experiences.

Further, even if the Court were to accept Defendants' argument that these decisions are not arbitrary, the Court can perceive of no possible way that a standard based on an individual inspector's personal experience could put Plaintiff on notice of what is proscribed.

The lack of standards is unfair to Plaintiff and inspectors alike. Darrell Guensler, the Chief of the Division of Measurement Standards, State of California, describes defendants' approach as (a) unfair to processors like Cook because processors "can't predict what an inspector is going to allow", and, (b) unfair to inspectors "in that it places them in a very difficult position, uncertain position, as to how much allowance to provide".[54]

Therefore, the state implementation of its law through the DMS Procedure Manual, allowing undefined discretionary mois-

**49.** Delperdang Depo., 23:18–25, 24:1–8, 41:8–16, 51:23–25, 52:1–5, 51:14–17 (Emphasis supplied).

**50.** Opposition, 23.

**51.** Burnette Decl., 8:10–11.

**52.** Defendants' Statement of Genuine Issues, 7:20.

**53.** Defendants argue "gray area" perhaps by way of analogy. Gray area, in fact, does not apply to the products in question in the case at bar.

**54.** Guensler Depo., 23:20–26, 24:1–26, 75:17–26, 76:1–26.

ture loss allowance, fails to provide fair notice to Plaintiff. Plaintiff has been denied its right to due process.[55]

#### IV. *Burden on interstate commerce*

Next, Plaintiff argues that the California regulatory scheme is an impermissible burden on interstate commerce and thus violates the commerce clause. Essentially the same argument was made in *General Mills, Inc. v. Jones*, 530 F.2d 1317 (9th Cir.1975), the companion case to *Becker, supra.* In *General Mills,* the plaintiff argued that the flour it had shipped complied with federal law upon dispatch, but due to resulting distribution moisture loss, California inspectors rejected it.[56] The commerce clause argument was rejected by the court which held as follows:

> The regulation of weights and measures has historically been, and is now, a matter of local concern and within the competent exercise of the police power of the States. Any holding that the enforcement of state weights and measures regulations by California unreasonably burdens interstate commerce is foreclosed by the Supreme Court's decision in *Sligh v. Kirkwood,* 237 U.S. 52, 35 S.Ct. 501, 59 L.Ed. 835 (1915) ...

*General Mills,* 530 F.2d at 1322 (Citations omitted).

Plaintiff contends that the regulations burden interstate commerce despite *General Mills* because of the unequal standards enforced in the various counties.

The commerce clause, pre-emption, and due process arguments are inexorably intertwined in this case. California clearly has the power to enforce different weighing schemes. *Id.* Federal law provides for concurrent jurisdiction, although it is clear that federal law prevails. *See* 55 Fed.Reg. 49830, Response, Comment 18. Plaintiff's argument is better placed in the context of preemption and due process, especially when considering the internally inconsistent standards Plaintiff argues.

*General Mills* precludes the Court's consideration of the interstate commerce burden because it essentially decided the identical issue.

#### V. *Request for dry tare approach*

▮ Finally, Plaintiff's request that the Court order Defendants to use the dry tare procedure when weighing Plaintiff's products. The Court is not inclined to so order for two reasons: (1) both wet and dry tare are acceptable to the FSIS and state and local governments can choose which approach to use (55 Fed.Reg. 49829); (2) Plaintiff has made no prayer in its pleadings that Defendant be restricted to the dry tare approach.

Plaintiff's fourth claim for relief in its First Amended Complaint asks for an injunction preventing the State of California and its employees from using, applying or implementing wet tare regulations that are inconsistent with federal law. No prayer is made for an injunction requiring Defendants' use of the dry tare method. Therefore, summary judgment is not the proper vehicle to pursue this new claim.

### CONCLUSION

Having carefully considered the entire matter, the Court: (1) finds that there are no issues of material fact relative to claims 1 and 2 of the First Amended Complaint; and, therefore, recommends GRANTING Plaintiff's Motion for Summary Judgment relative to claims 1 and 2; and, recommends DENIAL of Plaintiff's Motion for Summary Judgment of the Issues relative to claim 3.

Claims 1–3 of the Motion for Summary Judgment correspond to the first three substantive claims of the First Amended Complaint. Claim four of the Motion for Summary Judgment does not track the language of the fourth claim for relief, but based on the rationale set forth in this recommendation, Plaintiff is entitled to the injunctive relief sought in its First Amend-

---

**55.** This issue was the only one argued at the hearing conducted on March 19, 1991.

**56.** It was rejected under the same Business and Professions Code § 12211 that allowed no variation in stated weight due to moisture loss.

ed Complaint on the basis of its first and second claims for relief. Summary judgment on Plaintiff's third claim should be DENIED.

Pursuant to Fed.R.Civ.P. 54(b) the Court expressly determines that there is no reason to delay entry of judgment although the third claim for relief remains to be adjudicated. The relief requested in the first and second claims should be implemented forthwith. The outcome, after trial or otherwise, of the third claim for relief will not affect the relief granted herein.

IT IS THEREFORE RECOMMENDED that an Order issue from the Court (1) approving and adopting this Report and Recommendation as the findings of fact and conclusions of law herein, (2) GRANTING Plaintiff's motion for summary judgment on claims 1 and 2, (3) GRANTING Plaintiff the injunctive relief sought in claim four of its First Amended Complaint, (4) DENYING Plaintiff's motion for summary judgment on claim 3, and, (5) entering judgment accordingly as to claims 1, 2, and 4.

Dated: March 28, 1991

## FINAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This Final Report and Recommendation and the attached Report and Recommendation are submitted pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and General Order 194 of the United States District Court for the Central District of California.

On April 1, 1991, the Clerk filed Notice of Filing of Magistrate Judge's Report and Recommendation and the Lodging of the Proposed Order, which was served on the parties together with copies of said Report and Recommendation.

Defendant Kathleen Thuner, separately, and Defendants Henry Voss and the California Department of Food & Agriculture joined by Gerald Hanson, have timely filed their Objections to the Report and Recommendation [hereafter Thuner opposition and Voss opposition, respectively]. The Magistrate Judge has carefully read and considered both filings, but he is not persuaded to modify his recommendation in any respect. The Objections set forth are, in large measure, a repetition of the arguments asserted in Defendants' original oppositions to the motion for summary judgment.

As a primary issue, the Court's finding that summary judgment is appropriate and that there are no genuine issues of material fact is based wholly on the pleadings and affidavits supplied by the parties. All parties agree on the key factual issue, that reasonable moisture loss is determined by the general experience and prior knowledge of each inspector.[1] Therefore, the Court is not making prohibited factual determinations in its decision. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; ..." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Kathleen Thuner argues that the Court misapplied the preemption doctrine because in the Report and Recommendation the Court discusses the individual field inspector's application of the pertinent state law. The Court, in fact, used the individual's application of the law to illustrate why it must be pre-empted. The state law in question is:

When used on commodities that are subject to moisture loss consideration during distribution, reasonable moisture loss allowances or applicable established gray areas must be considered before an enforcement decision is made.

(Cal.Code of Reg., title 4, § 4650, effective January 20, 1991).

As the Court noted, the law *apparently* requires reasonable moisture loss allowances. However, the pertinent inquiry is how an inspector determines the reasonable moisture loss, and California, in its

---

**1.** Plaintiff's Statement of Uncontroverted Facts and Conclusions of Law, pars. 22, 33, 36, 37; Defendants' Statement of Genuine Issues, admitting pars. 22, 33, 36, 37.

Division of Measurement Standards Procedure Manual, requires that:

> Upon determination that a particular lot of a commodity is subject to an allowance for moisture loss, weights and measures officials *should use discretion* based upon prior knowledge and data to arrive at a "reasonable" value to be allowed.[2]

The Procedure Manual does not *require* an inspector to use a reasonable moisture loss, rather it causes him to determine such loss based on his prior knowledge and data. The value to give the data, as well as the value based on prior knowledge, by necessity, will vary from inspector to inspector. That is the focus of the Court's Report and Recommendation. The fact remains that a weight and measure official who "should use discretion" to arrive at a reasonable value, can arrive at zero, specifically what *Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) sought to prevent. As Defendant Thuner points out, "the essential issue is does the applicable state law (and applicable regulations) require a reasonable moisture loss allowance."[3] The answer, as explained above and in the Report and Recommendation, is no. Therefore, pre-emption is proper.

Defendant Thuner next objects to the Court's determination that the numerical standards used by Defendants were arbitrary and failed to put Plaintiff on notice of unallowed moisture loss values. Defendant Thuner objects to the Court's statement that the evidence presented by Defendants was unconvincing, arguing that such a "finding" is within the domain of the jury.[4] Contrary to this argument, the Court is not implying that a jury would find the evidence unconvincing, rather, the Court is noting that the statements of the field inspectors and their instructor demonstrate, without controversy, that a wholly discretionary standard effectively amounts to no standard.[5] Furthermore, a standard based on an inspector's varied personal experience cannot put Plaintiff on notice of what is proscribed. Therefore, Plaintiff is denied due process.

Defendant Thuner objects to the Court's Judgment and Permanent Injunction. She contends that the recommended injunction is too broad, broader even than the injunction sought in Plaintiff's Motion for Summary Judgment. That is not so. Plaintiff's Motion asked the Court to enjoin Defendants "from using any wet tare test which fails to provide a moisture loss allowance."[6] Additionally, Plaintiff supplied Defendants with copies of proposed judgments (proposed alternative 1, proposed alternative 2) from which the Court adopted the language for the judgment. Therefore, since the language in question was included in Plaintiff's Motion for Summary Judgment and the Proposed Judgments filed therewith, Defendants were put on notice of the proposed injunction. Thus, Defendants had a full and fair opportunity to contest its scope. They failed to do so.

Finally, she argues that an award of attorney's fees is premature. Defendant Thuner acknowledges that the Court has discretion to award fees in a 42 U.S.C. § 1988 case and that there is a presumption that the prevailing party is entitled to fees. She argues, however, that she should be afforded a hearing to argue that there are special circumstances that militate against such an award. She presents no authority that mandates a hearing; there is no evidence or indication of special circumstances that cause the award to be unjust. The complaint asked for reasonable attorney's fees and the Court determined, based on the facts presented that the prevailing party is entitled to them. The Court, in its discretion, awards reasonable fees to Plain-

---

**2.** Kushman Depo., Exhibit A (DMS Procedure Manual, 195) (Emphasis added).

**3.** Thuner Objections to Report and Recommendation, 4.

**4.** *Id.* at 5.

**5.** *See e.g.* Kushman Depo., 26:1–10, 26:25–28, 27:1–28, 28:1–6, 28:24–28, 29:1–3, 30:11–20, 42:2–7; Dickerson Depo., 31:25–26, 32:1–8, 32:13–19; Delperdang Depo., 23:18–25, 24:1–8, 41:8–16, 51:23–25, 51:23–25, 52:1–5, 51:14–17.

**6.** Memorandum of Points and Authorities in Support of Plaintiff's Motion, 56.

tiff subject to setting the actual amount at a later date.

The Voss Defendants, in their first argument, raise and address an issue that has heretofore not been presented to the Court. They argue that Plaintiff had a duty to establish that the products taken off sale had been distributed under "good distribution practices." If not, they argue, then "no moisture loss needs be given." [7]

The issue has not been raised and no evidence, in any form, has been presented. Defendant relies on a statement made by Marianne Delperdang, a California Department of Food & Agriculture employee, that the product looked "too wet." [8] That does not lead the Court to conclude that there is a triable issue of fact. Indeed, Defendants did not include this "issue" in their Genuine Issues of Material Fact, required under Local Rule 7.14.2, filed on March 1, 1991.

Next, Defendant Voss argues that a triable issue exists as to whether Defendants acted reasonably in determining the moisture loss allowance. However, the issue is not the reasonableness of Defendants' actions, but rather the unbridled discretion that inspectors have in determining a reasonable moisture loss.

Defendant Voss also objects to the Court's Judgment and Injunction. His objections are essentially limited to the underlying substantive decisions that provide the foundation for the Injunction. Those arguments were covered in depth both in the Report and Recommendation and in this Final Report and Recommendation.

IT IS THEREFORE THE FINAL RECOMMENDATION OF THE MAGISTRATE JUDGE that an Order be issued by the Court (1) approving and adopting these Reports and Recommendations as the findings of fact and conclusions of law herein, (2) GRANTING Plaintiff's motion for summary judgment on claims 1 and 2, (3) GRANTING Plaintiff the injunctive relief sought in claim four of its First Amended Complaint, (4) DENYING Plaintiff's motion for summary judgment on claim 3, and, (5)

entering judgment accordingly as to claims 1, 2, and 4.

Dated: May 13, 1991

---

**7.** Voss Objections to the Report and Recommendation, 4).

**8.** Delperdang Decl., 6:9–10.